After advisement, the following opinion was delivered in the supreme court:

By the CoiCrt,

Bronson, J.
We have so recently considered some of the questions which arise in this case, that it cannot be necessary to examine them much at large on the present occasion. Nothing which fell from the respondent’s counsel has shaken the opinion we have heretofore expressed, that in these unhappy controversies between husband and wife, the former, *57 if he chooses to assert his right, has the better title to the custody of their minor children. The law regards him as the head of the family ; obliges him to provide for its wants; and commits the children to his charge, in preference to the claims of the mother or any other person. The People v. Chegaray, 18 Wend. 637. The People ex rel. Nickerson, 19 Wend. 16, and cases cited. See also The King v. Greenhill, 4 Ad. & Ellis 624. The King v. Isley, 5 Ad. & Ellis, 441. Whatever sympathy we may feel for this lady, or however strongly we may wish that the relator had relinquished his claim to one of the two children, we have no choice but to administer the law as we find it.
In cases of voluntary separation between husband and wife, there must of necessity be some legal rule in relation to the custody of their minor children ; without it, the matter would probably be determined by force. This would be likely to widen the breach between the parties ; and if it did not endanger the personal safety of the children, it could hardly fail to alienate their affections from one or both of the contending parties. Whether the common law has given a just and proper rule, or whether a better might not be devised *are questions which do not address them- [ *73 ] selves to our consideration.
On habeas corpus, the court usually does no more than to relieve the party from all improper restraint. But in the case of children of such tender years as to be unable to elect for themselves, an order is made in relation to their custody.
The right of the father may be forfeited by misconduct, or lost by misfortune : and when he attempts to assert it by habeas corpus, the court exercises a discretion, having regard to the welfare of the children, and may leave them in the custody of the mother or some other person, in preference to the claims of the father. Matter of McDowles, 8 John. 328. Matter of Waldron, 13 John. 418. Matter of Wollstonecraft, 4 John. Ch. R. 80. But this is not an arbitrary discretion or a license to do what we please in relation to the custody. On the contrary, I deem it well settled, that, in the absence any positive disqualification on the part of the father, for the proper discharge of his parental duties, and when there is no other special reason, touching the welfare of the children, for preferring the mother, the father has a paramount right to the custody, which no court is at liberty to disregard.
In taking into consideration the probable welfare of the children, we do not presume, without proof, that it will be best promoted by preferring the mother. The law has settled that question the other way, by preferring the father. His claim cannot be set aside upon light grounds, or upon mere conjecture that the interests of the children require it. He must be chargeable with such grossly immoral conduct, as shows him plainly disqualified for the *58 proper discharge of parental duties; or else it must appear, that, in consequence, of disease or some other misfortune, he wants either the capacity or the means for the proper training of the children, according to their circumstances and expectations in life. And whatever may be the objections to the father, they cannot prevail, if the same objection, or others of the like magnitude, can be urged against the mother. In short, the claim of the father is preferred, until it plainly appears that the interests of the children require it to be set aside.
[ *74 ] *In settling the question of custody, we. have nothing to do with the causes which led to the separation of the husband and wife, except as those causes affect personal character, and touch the qualifications of the parties for the proper exercise of the parental office. If we go beyond that, we violate a principle which lies at the foundation of the whole matter, by overlooking the welfare of the children, for the purpose of punishing one of their parents.
In this case, the respondent appended to his return before Judge Inglis, an affidavit made Mrs. Barry, when the parties were before the recorder; and another affidavit made by her when the matter was before the chancellor. Aside from these affidavits, there is not a particle of evidence going to impeach the relator’s title to the custody of the child. Indeed, he stands before the court chargeable with no fault, while the wife is without a shadow of excuse for the desertion of her husband.
There is a serious objection against receiving these affidavits, except in cases where the party seeks protection against personal violence, the general rule certainly is, that the husband and wife cannot be witnesses against each other; and. I have never been able to get over the difficulty which I felt in The People v. Chegaray, 18 Wend. 637, concerning the admissibility of such evidence. Where there has been no act or threat of personal violence, it can rarely, if ever, answer any valuable end in the administration of justice, to inquire into those little difficulties and private griefs, which sometimes exist between husband and wife ; and spreading their differences before the world could hardly fail to widen the breach between the parties, and put an end to all hopes of reconciliation. This would be so, if the proof came from other sources ; but it would be much worse, if the parties were suffered to become mutual accusers of each other.
But in the view I have taken of the case, it is unnecessary to pass definitively upon the admissibility of such evidence. On looking into these affidavits we find that Mrs. Barry, entertained suspicions against her husband, and complains of unkind treatment. Her suspicions are wholly unsupported by proof; and'if we read hercomplaints in connection with the re- [ *75 ] butting *evidence from other sources, we cannot but see that she was as much at fault as her husband, in the angry controversies *59 which sometimes sprung up between them; And if we lay the rebutting evidence entirely out of the case, on the ground that it was not received by the judge, and then make but a reasonable allowance for the probable coloring of an interested and excited party, there is nothing in the affidavit of the wife laying a proper foundation for rejecting the husband’s claim to the custody of the child. Mrs. Barry, taking her own statements and rejecting all explanations, has made out nothing like a case for asking a divorce, either absolute or limited; and although she has cause of complaint against her husband, there is no reason to doubt that he is as ¡.well qualified as she is for the proper discharge of parental duties. That is enough to settle the question of custody in his favor; especially in a case where it does not appear, that the child has any expectations in the way of property or advancement on the part of the mother, which will be lost by yielding to the claim of the father.
Had Mrs. Barry, been able to charge her husband with some of those grossly immoral acts which authorize a divorce, either absolute or limited, it would not necessarily follow that she was entitled to the custody of the child. The husband may be in fault in relation to his conjugal duties, and still it may be quite clear that the welfare of the children, which is the controlling consideration, will be best promoted by committing them to the custody of the father. But Mrs. Barry has no such heavy accusations to bring against her husband. She relies on a highly wrought picture of their family jars, in which it is very probable there were faults upon both sides ; and which, in any point of view, do npt form a proper subject for judicial inquiry. We cannot go beyond such acts as authorize a legal separation. 2 R. S. 144, Art. III. IV. Those are matters which admit of trial. Courts and juries can inquire into them with a reasonable prospect of arriving at truth. But most of the many little things which go to make up the happiness or misery of married life, are of such a nature that they do not admit of any satisfactory judicial investigation.
*On this branch of the case, we think there is nothing which [ *76 ] has any legal tendency to control the relator’s right to the custody of the child.
Mr. Barry is a subject of the Queen of Great Britain, and will probably remove the child to his residence in Nova Scotia; but that is not a valid objection to his claim. In the case of The King v. De Manneville, 5 East. 220, the mother and child were English subjects, and the father was not only a foreigner, but an alien enemy ; and yet the court of king’s bench refused on habeas corpus to restore the child to its mother, although the father had taken it from her by violence, and she swore that she had separated from her husband on account of ill treatment. Application was then made to the Herd Chancellor, as the representative of the king as parens patrice ; aqd *60 he made an order restraining the father from removing the child out of the kingdom. He proceeded on the ground that the child was a British subject and a ward of the court, and the father an alien enemy. But he refused to restore the child to the mother, because she had voluntarily separated herself from her husband. In relation to that, he said, “ I must consider the wife at present as living under circumstances under which the law will not permit her to live,” that she is “ not living with the father according to the obligation of the marriage contract, which I am bound to consider subsisting, until I am told by better authority than affidavits, that it ought no longer to subsist. This is an application by a married woman, living, in a state of actual unauthorized separation, to continue, as far as the removal of the child will have an influence to continue that separation, which I must say is not authorized by law.” De Manneville v. De Manneville, 10 Ves. 52. These remarks are not altogether inapplicable in this case.
Whether our court of chancery possesses any such jurisdiction as was exercised by Lord Eldon, in the case ofDe Manneville, is a question which we need not consider. It does no arise upon this habeas corpus; and besides, the relator, though a foreigner, is not an alien enemy. In the present state of civilization, and when inter-marriages between citizens and sub- [ *77 3 jects of different governments are so *common, I cannot believe that any court, either in this country or Great Britain, would think of restraining a party in the exercise of either his conjugal or parental rights, on the sole ground that he was an alien. It would be highly immoral, as tending to break up the marriage contract, and sunder the ties of kindred ; and could only be justified, if at all, in a state of war, when the principle of self protection becomes paramount to almost every other consideration.
It is also said, that the relator has concluded himself, from demanding the child by the agreement of the 7th of June, 1838. But this agreement is void on several grounds. Although the respondent is named in, and has affixed his seal to the instrument, he is not a party to it for any practical purpose. There is no covenant by or with him. These is neither trust nor trustee. It is simply a covenant between husband and . wife, who are not competent to contract with each other. There is no consideration for the re-, lator’s covenant. No one agrees to indemnify him against the maintenance of the child which is to be left with the mother. And finally, the deed was made to provide for & future separation between the parties, which the law will not sanction. Carson v. Murray, 3 Paige, 483. Rogers v. Rogers, 4 Paige, 516. Hindley v. Westmeath, 6 Barn. & C. 200. Westmeath v. Westmeath, 1 Dow Parl. Rep. N. S. 519. It is well worthy of consideration, whether all agreements based on the voluntary separation of husband and wife, are not contrary to law and absolutely void. But it is enough that this is clearly an illegal covenant.
*61 The next question relates to the conclusive effect of the prior proceedings before the recorder and the chancellor. The judge decided that the matters in difference between the parties, were to be considered as res adjudícala up to the time of the chancellor’s decision; and that he would only hear evidence of matters that had arisen since that time. Notwithstanding this decision, he afterwards received evidence on the part of the respondent, which went back of the chancellor’s order. I do not see upon what principle this evidence was admitted. Estoppels must, in general, be mutual; and if the relator was concluded by the prior decision, so also was *the [ *78 ] respondent. But this is not a matter of much practical importance ; for in the view I have taken of the case, the agreement between the husband and wife, concerning the custody of the child, and the other evidence which was given of matters existing anterior to the chancellor’s order, could not properly vary the result.
The more important question, is, whether the judge was right in holding the relator concluded by the prior proceedings. Among the reasons urged against that decision, it is said: first, that the chancellor acted as a commis. sioner, and not as a court: 2 R. S. 563, § 23, 73 : and that the doctrine of res judicata only applies to the judgment of a court; not to orders made by a judge or other officer out of court. Second, that proceedings upon habeas . corpus, and other prerogative writs, such as mandamus and prohibition, are not in their nature conclusive ; and that if the writ is denied by one .court, the party may afterwards apply to another. 2 R. S. 563, § 21,38. Smart v. Wolfe, 3 T. R. 340. Le Caux v. Eden, Doug. 620, note. Yates v. The People, 6 John. 328-9 445, 468. And third, that the proceedings upon habeas corpus are in the nature of summary applications to the discretion of the court, where the decision does not conclude a further investigation of the matter, either in the same or another forum. Simson v. Hart, 14 John. 63. Dickenson v. Gilliland, 1 Cow. 495. Without passing upon these questions, I am of opinion, upon other grounds, that the judge erred in holding the relator concluded by the former proceedings.
It is here proper to remark, that the petition, writ and other papers before the recorder and the chancellor, were not given in evidence before Judge Inglis ; and the only means we have of ascertaining what point was decided by those officers respectively, is an inspection of the orders which they made.
In relation to the proceedings before the recorder, it is enough to say, that he did not profess to make any final disposition of the matter. He left it as he found it, to be setled at another time. His order was, that the child “ remain in the care and custody of her mother,” not permanently, *but until the husband and wife should make some arrange- [ *79 ] ment, “ or until the custody of the said child shall be changed by *62 judicial decision.” It is impossible to maintain that this was a final adjudition upon any point whatever. The whole matter was left open to be settled by “ judicial decision.” It would be strange indeed, if the relator could be barred in seeking a judicial determination of his right, by a judgment which not only left the question unsettled, but pointed him to the very remedy which he afterwards pursued.
The order of the chancellor, after reciting that the mother was under no restraint, passes upon two points in relation to the child: first “ that the said infant daughter is not improperly restrained of her liberty by the said Thomas JR. Merceinand second, “ that no good reason now exists for taking the said infant child from its said mother.” How, regarding this decision as absolutely conclusive upon the points decided, I do not see, how it could properly affect the question afterwards on trial before Judge Inglis. The first point decided by the chancellor was, that the child on the twenty-sixth of August, the day the order was made, was “ not improperly restrained of her liberty” by the respondent. It certainly did not follow, that there never would be any such restraint; and we must give the decision a much wider influence than properly belongs to it, before it can be made to reach the question which was presented to Judge Inglis, some months afterwards. And here I may notice, that before that officer, the custody of the child was not only expressly admitted by the respondent in his return, but it was abundantly proved. I refer to the letters of the 28th and 29th of August. The respondent, hav-" ing the wife and child then in his house, writes to the relator, saying-“I now positively forbid you coming in my house at all, until this interdiction is revoked in writing by me.” Then follows a letter from the wife, with the written approval of the respondent, giving the relator a license to have one sight of his child, “ provided you signify your intention to me in a note 24 hours previous;” and allowing him the further privilege of calling [ *80 ] quarterly, on the like notice, “ unless any thing “shall occur which in my opinion shall render such future course injudicious.” It is needless to say that, except in an extreme case, no man of spirit would consent to see his child upon such terms.
In the case of a child under two years old, and having no will of its own in relation to the place of residence, it is not necessary that bolts and bars should be used. For all legal purposes, the child is in the custody of those with whom it lives. .In Exparte McClellan, 1 Dowl. Pr. Ca. 81, although all improper restraint was denied, and the child was in a delicate state of health, she was taken from the mother and delivered to the father. In the case of lord Westmeath’s children, 1 Jacob, 245, note (c), the mother returned to the habeas corpus, that the children, one of whom was five years old, and the other seven months, “ were not under imprisonment, restraint or duress of any kind;” but she admitted that she had “ the care and custody of *63 their persons” by virtue of a deed of settlement. She further returned, that the children “ were tenderly and properly nurtured and taken care of by her ; and that it was for their benefit and advantage that they should remain in her care:” but the lord chancellor made an order for the delivery of the children to their father. This case goes beyond the point now under consideration, and, with many others, establishes the paramount right of the father to the custody of the children.
The question here is, not whether the child is actually suffering under duress of imprisonment, but whether there is that kind of restraint which defeats the right of the father. The respondent, having the child under his roof, positively forbids the father to enter the house, except upon terms which a proper self respect made inadmissible ; but if he could submit to the terms, he only had a license to enter the house “ to see Mary”—not for the purpose of taking her under his care and protection. It is impossible to deny that this is such a restraint as defeats the right of the father to the custody of his child, and lays a proper foundation for asking redress by habeas corpus. These facts did not exist at the time the chancellor’s order was made; and I repeat, that his judgment, that there was no improper restraint on the 26th *of August, cannot conclude the [ *81 ] relator as to matters which have transpired since that time.
But it is said, the chancellor did not decide that there was no restraint, but only that the child was “ not improperly restrainedand that, in point of fact, he passed upon the title of the father to the custody of his child, and decided it against him. The answer to this argument is, that it does not appear by the order that any such question was decided ; and the rule is, that the adjudication is only conclusive when “ directly upon the point f and is not evidence of “ any matter to be inferred by argument from the judgment.” Dutchess of Kingston’s case, 20 Howell St. Tr. 538. We cannot go a single step beyond the judgment, for the purpose of inferring any thing which it does not plainly declare.
The other point decided by the chancellor was, “ that no good reason now exists for taking the said infant child from its mother.” This part of the order is open to the very obvious remark, that it does not purport to be a final judgment upon the rights of the parents. The language is guarded. The order does not profess to settle the title, but only affirms that ‘1 no good reason now exists” for interfering between the parties. For aught we can see, there may have been very special reasons, such as the dangerous illness of the mother or child, for not making a final disposition of the matter at that time; and the language of the order strongly favors the conclusion that the chancellor only intended to decide that he would not then interfere, without concluding any thing as to the future. And here I may once more remark, that we are not at liberty, for the purpose of making out an estop *64 pel, to infer any thing from the judgment which it does not plainly declare ; and it neither appears, in terms, nor by necessary implication, that the chancellor decided, or intended to decide, the question which was afterwards presented to judge Inglis, to wit, whether as between the father and mother, the former had not the better right to the custody of the minor children.
But there is another, and an insuperable objection, to holding the relator concluded by the former proceedings. The petition for the habeas [ *82 ] corpus, and the other papers *before the chancellor, were not given in evidence before Judge Inglis ; and a like remark is applicable to the petition and papers before the recorder. Estoppels are not favored in the law, and he who sets them up must make out his case. He must show that the same matter was not only adjudged, but that it was directly in question in the first suit, before it will be good by way of estoppel in a second action. Duchess of Kingston’s case, 20 How. St. Tr. 538. Outram v. Morewood, 3 East, 346. 1 Phil. Ev. 334-5. Cow. & H. notes to Phil. 1003-4. The pleadings, or other allegations between the parties', as well as the verdict and judgment in the first suit, must be given in evidence. The judment itself, whatever may be its language, or whatever it may profess to decide, concludes no one by way of estoppel, until it appears what issue was joined between the parties. So where a party sets up the decree or order of a court of equity as an estoppel, he must produce the pleadings, or the petition and other allegations, on which the decree or order was founded. 1 Phil. Ev. 392-3. Gresley Eq. Ev. 108—10. Roscoe Cr. Ev. 157-8. In short, it must appear that the matter adjudged in the first suit was plainly involved in the issue joined between the parties. It is clear, therefore, upon several grounds, that the relator was not concluded by the adjudications upon the prior writs of habeas corpus.
It follows from what has been said, that the judge erred in the disposition which he made of this case. He should have made an order committing the child to the care and custody of the relator.
We have taken the most favorable view of this case for the respondent, by considering the evidence as well as the record properly before us. If this case comes within the habeas corpus statute, it may well be doubted whether the certiorari brings up any questions of evidence. 2 R. S. 573, § 69. Birdsall v. Phillips, 17 Wend. 464. But it will be seen by the whole tenor of the second article of that statute, that it does not apply to this case. The judge exercised a common law, not a statute authority, when he issued the habeas corpus; and the proceedings are consequently before [ *83 ] us on a common law certiorari, which removes nothing but the *record. In such cases, although evidence may be returned, we cannot look into it. This point has been often a -judged; and the disposition which we felt to examine the case in the most favorable point of view *65 for the wife, and which has led us to consider the evidence, must not be drawn into precedent hereafter. Looking only at the record—which in this case consists of the petition of the relator for the habeas corpus, the writ issued, the respondent’s return to it, and the judgment rendered thereon— we have nothing but the naked case of a father demanding his child, the respondent admitting the child to be in his custody, and showing no good reason whatever for continuing the restraint; and yet judgment has been rendered against the father. In this there is manifest error.
We cannot, upon certiorari, go beyond a reversal of the proceedings ; and we must leave the relator, if he shall be so advised, to apply for a habeas corpus for the purpose of giving effect to our judgment.
Whereupon, the proceedings before Judge Inglis were reversed.
The respondent sued out a writ of error, removing the record into this court, where the case was argued by
J. W. Gerard and S. Stevens, for the plaintiff in error.
John A. Barry, the relator in person, in his own behalf.

Points presented and argued on the part of the plaintiff in error.

I. —The supreme court, on a common law certiorari, (which in the last clause of their opinion they admit this to be) can only inquire ivhether the judge had jurisdiction and his proceedings were regular; they neither correct errors of law nor of fact. The supreme court in this case have departed from that rule, and have reviewed matters both of fact and law. 17 Wendell, 464. 21 Id. 651.
II. —The decisions of the recorder and of the court of chancery were res adjudicada up to their respective *dates, and no sub- [ *84 ] sequent facts appeared to change the rights of the parties.”—2 Johns. R. 210. 7 id. 20. 10 id. 365. 11 id. 530. 3 Cowen, 120. 4 id. 562. 8 Wendell, 492. Kitchen vs. Campbell, 3 Wilson’s R. 304. See also 3d vol. of Phillipps on Evidence ; Cowen and Hill’s notes, page 824, note 586, applicable to the decisions of all tribunals, whether formal judgments or not; and whether made in courts of record or not; and whether they be courts of general or limited jurisdiction.
The three reasons given by the majority of the court of errors in Simpson vs. Hart, 1 Johns, Ch. R. 93, which is reported in 14 Johns. B. onp. 63, for reversing the decision of the chancellor, do not apply to this case. Here the proceedings before the recorder and the court of chancery were not mere summary applications within the meaning of that term, but were commenced by writ (of habeas corpus,) the latter issued by the court of chancery under *66 its seal. Evidence was heard, and there was grave and elaborate discussion, and the recorder gave his judgment, and the court of chancery pronounced its decree upon the merits of the controversy.
The decision of the recorder and the decree of the court of chancery could have been thrown into the shape of a record, and become the subject of review in another court, viz., that of the recorder by certiorari to the supreme court, and that of the court of chancery by writ of error to this court.
Judge Inglis did allow the relator to give subsequent facts in evidence to show a change in the rights of the parties, if he had any such evidence to offer.
The question of res adjudicóla, the great matter decided by Judge Inglis, was entirely avoided by the supreme court, and they reverse his decision without touching upon the question on which it was based, and for causes which were not decided by Judge Inglis, and on which his decisions were not asked.
The supreme court erred in holding that the decisions of the recorder and of the court of chancery were not final judgments, and also in deciding that the subject matter for the decision of Judge Inglis, viz., the custody [ *85 ] of the child as *between the father and mother, was not previously decided by the recorder or the court of chancery. In the proceedings on a habeas corpus (emphatically called the “ writ of liberty”) all form and technicality are disregarded, and substantial right only sought for. The decisions of both those tribunals were not only substantially but formally correct. They adjudged that the child was under no illegal restraint, and returned it to the custody of the mother, against the claim of the father. The only question to be decided on a habeas corpus in regard to the custody of a child, is that of present possession. No right to the guardianship or custody of the child for future time, however short, can be determined on a habeas corpus. That is to be done by the court of chancery alone, on bill or petition. Bacon’s Abr. Hab. Corp. A. and B. 13, notes.
In this case the recorder and the court of chancery did decide as to the right of the parents to the custody of the child, which was all they could decide, and the criticisms of the supreme court on those decisions, sacrifice substance to form.
The supreme court also erred in declaring that the respondent was not entitled to the benefit of the pleas of res adjudicata, as the respondent did not produce in evidence the original writs and petitions :
1st. So such point was taken by the relator at the hearing before Judge Inglis. They were set forth in the return, and also the decree of the court of chancery was read in evidence without objection, which, of course, waived the production of the writ and petitions, if on objection taken, they could *67 have been demanded to be produced before the judgments were read, having been set forth in the return. 3 Cow. R. 127.
2d. This being admitted by the supreme court in the last clause of its decision to be a common law habeas corpus, the return not only proves itself, and all matters (including records) therein averred, but at common law is conclusive, and c annot be contradicted. The statute, however, in the 48th section of the habeas corpus act, permits the relator to *con- [ *86 J tradict the return, and put the matters therein averred in issue, hy an affidavit denying the truth of the facts set forth in the return. No such affidavit was made, or issue taken, but the matter of res adjudicata before Judge. Inglis was in the nature of a demurrer to the return. Bacon’s Rah. Corp. A. and B. 13.
HJ.—Judge Inglis did not err in admitting the agreement drawn up hy the relator himself, by which he ceded to Mrs. Barry for all future time the custody of the child now claimed hy him, although executed before the chancellor’s decision, it being a fact existing subsequently thereto, and up to the present time operating as a continuing estoppel inprcesenti.
It does not appear that Judge Inglis based his decision on that agreement; and if he was correct in his decision as to res adjudicata,'as no facts subsequent to the decision of the court of chancery were given in evidence by the relator, his judgment should have been affirmed, although he may have erred in admitting the agreement; and the supreme court concede that the admission of this agreement had no effect on their decision.
The agreement by which the relator conceded to Mrs. Barry the possession of the child, are urged under three distinct aspects, either of which being maintained, independent of all other considerations, she is entitled to retain the possession of her child :
1st. That agreement was valid, and a flat bar as to the question of the possession of the child. It was not an agreement for separation of the parties, (as the supreme court suppose,) either present or future, but merely relates to the disposition and custody of their children, a subject matter on which parents can treat, especially through a trustee. It was founded on good consideration, viz., the agreement of Mrs. Barry not to take legal proceedings, which she was about to do, for a separation, by which she would have claimed the custody of both children.
2d. If the agreement is not a bar, it is his admission that his wife ought to have the custody of her female child, which *is a £ *87 ] continuing admission acting in prcesenti, up to the time of Judge Inglis’ order.
3c?. This agreement, drawn up, signed, sealed and solemnly delivered by the relator himself, being executed by Mrs. Barry, in his favor, by her surrendering to him op his demand her oldest child, then an infant of 22 months *68 old ; he is estopped from committing a fraud, by denying its validity as for this purpose, and no tribunal should aid the relator in violating an agreement thus solemnly made. 9
The supreme court err in their views on the form of this agreement. In looking at it, the court should not regard its form' Or want of form, which was the work of the relator himself, but the object the parties had in view in executing it, which was in quieting the mother in the possession of this child.
Collateral covenants in articles for separation will be enforced. 3 Brown’s Chancery Cases, 614. 8 Modern Rep. 22. 2 Atkyns, 511. 2 Barn. & Creswell, 547. 2 East, R. 283. 2 Sim. & Stewart, 372.
Our statutes, 3 R. S. page 82, new edition, recognise separations for cause between husband and wife zoithout divorce, and provide, in such cases, for taking children from the custody of their fathers.
IV. The father has no paramount, unalienable right to take the children from their mother, regardless of their age, sex and circumstances. The English decisions on that head are, at least, contradictory ; and those before the revolution (which alone are authority with us) agree with the decisions of this country. The uniform current of American authority is, that where the mother, or even a stranger has possession of a child, and the habeas corpus is issued by the father, all that the court does is to relieve the child from illegal restraint, if there is any, and to set it free ; that maternal restraint is no illegal restraint; that if the child is of age to exercise its own judgment, the court allows it to go where it ivill—if not, the court may go farther, (but is not bound to go farther,) and in its own discretion may exercise its judgment for the child, having regard to its health [ *88 ] *comfort and welfare, and will not disturb the possession of the mother, unless in their discretion there is good cause for so doing, in order to promote the zvelfare of the child. 5 Binney’s Reports of Pennsylvania, 520. The Commonwealth v. Addicks and wife, 3 Mason’s Rep. 482, by Judge Story. 6 Greenleaf’s Reports of Maine, p. 462. The State v. Smith, 4 John. Ch. Rep. 80. 8 Johns. Rep. 253. 13 Johns. R. 418. The plaintiff in error also relies on the decisions of Recorder Morris and of the court of chancery in this case ; the decision of Judge Inglis ; the manuscript decision of Judge Randall, of Philadelphia, in the recent case of The Commonwealth v. Crumell; the decision of the Assistant Vice Chancellor of the first circuit, in the recent case of Ahrenfeldt v. Ahrenfeldt, and the decision of the three Judges of the court of general sessions in Philadelphia, just made, in the case of D’Hauteville v. his Wife. The principle of which unbroken chain of authority (viz., discretion in the Judgej is recognized in the case of The People v. Chegaray, 18 Wendell, 637, and the case of Nickerson, 19 Id. 16, the cases on which the relator relies.
*69 That the common law of England was, as is declared in this point, is shown by the decisions of Lord Mansfield and other judges, cited in the above American cases.' The common law was departed from, and contrary decisions made by some of the English judges; the first in the case of The King v. De Manneville, in 5 East. 220, in the year 1804, and the recent cases of 4 Adolphus and Ellis, which, however, have been overruled, and the common law restored by the act of parliament of 2d and 3d Victoria.
The act of our. legislature 2 R. S. 82, new edition, has settled the rights of the mother to be entirely different from what the supreme court in this case have declared them to be. It was not necessary to enact that where the mother had possession, courts might adjudge that possession to be continued in her, inasmuch as our legislators knew and recognized the common law to be, that courts and judges had the power in their discretion to confirm the mother in *the possession of the child, where the [ *89 ] proceeding was against her, as it was declared by the then existing decisions of our court of chancery, in the cases in 4 Johns. Oh. R. and of our supreme court, in the cases in 8 and 13 Johns. So also the above cited British statutes recognises the common law of England to be as we contend for, by enacting precisely as our statute does, only limiting the mother’s possession to seven years.
It cannot be imagined that our legislature and the British parliament would provide to take the children from the father and give them to the mother, on a habeas corpus taken out by her, and yet give her no right to retain possession of her child under the same circumstances, where the father sued out the habeas corpus against her. It is obvious, therefore, that our legislature and the British parliament impliedly admitted it to be the common law of this state and England; and therefore unnecessary to declare by legislative enactment, that where the mother had possession, on a habeas corpus issued against her, the courts have power to quiet and confirm her possession.
By common consent, in accordance with the dictates of nature and humanity, the mother is regarded as the guardian, by nature, of young children, especially of females, and as better calculated than the father to nurse - and protect them, both in sickness and in health, in the years of infancy. Rex v. Wangford, 1 Lord Raym. 395.
Can it be doubted that the health and comfort of this female infant, but two years old when this habeas corpus was issued, will be better promoted by its continuance with the mother, under the protection of the respondent.
If a husband, by repeated acts of harshness, neglect, and cruelty, such as are set forth in the return, renders his house intolerable to his wife, so that her health or reason is endangered, although he may not inflict blows, she is justifiable in living separate from him ; and no tribunal, governed by *70 the common feelings of humanity, will take her children from her, under such circumstances.
[ *90 ] Y. *The supreme court erred in reversing a decision, the subject matter of which is one of entire discretion in the court below, and which discretion may be regulated and controlled by the mere personal examination of the child.
Yl. Our courts will not lend their aid to make such a disposition of the , child by habeas corpus, by changing its custody, as will send it out of the jurisdiction of the American law. In every case in which it has appeared that the father intended to remove a child to a foreign country, he has been restrained by injunction from so doing. De Manneville’s case, 10 Ves. 52. 1 Maddox Chancery Practice, pp. 262, 263. Wood v. Wood, 5 Paige, R. 596, and the case of Ahrenfeldt v. Ahrenfeldt, decided'^ by the ¡.assistant vice-chancellor of this state. 2 Cox’s Chancery Cases, 241. 3 Peters’ R. 242. Shanks v. Dupoint, 7 Wheat. 283. 6 Binney, 204 and 205.

Points presented and argued on the part of the defendant in error:

I. The decision of Judge Inglis, that the proceedings before the chancellor made the subject matter of the habeas corpus “ res adjudieata,” and excluded his consideration of those matters, was erroneous. 19 Johns. 33. 2 Kent’s Com. note (c) 194. 1 Jac. 264, note (b) to Lyons vs. Blenkin. Mitchell’s Case, R. M. Charlton’s Rep. 464. 4 Con. En. Ch. Rep. 120, note (b). 2 R. S. Title 1 and 2 73. Habeas Corp. 465. Reviser’s note, 3 Revised Statutes, 785. 2 Bur. 855. 3 Black. Com. 111. T. R. 340. Doug. Rep. 620. 6 John. 427—8. 1 John. Ch. Rep. 91. Ros. Cr. Ev. 158. 5 John. 284. 1 Phil. Ev. 392-3. 5 Wend. 47. Gresley’s Eq. Ev. 108 to 110. 1 Jac. 245. 10 Cowen, 291. Cow. and Hill’s notes to Phil. 1104. 20 How. S. Tri. 538. 2 Barn. and Cres. 883. 2 Dev. and Bat. 486. 1 Phil. Ev. 333. 4 T. R. 254. Co. Lit. 352, (b). 4 Com. Dig. 79, Title Estoppel, E. 4.
[ *91 ] *11. That point, also, had been fully considered and decided the other way by the chancellor, acting as a commissioner under the statute, who heard the case after the decision of the recorder; and “ transit in rem judieatam” could as justly been predicated of it as of all other matters, did the law allow it of either.
IH. The judge ought to have decided the right of the parties, as if the case were “ res integra,” or “intactaand the rights of the relator to his child are clear in lato. 18 Wend. 642. 19 ibid. 16. 2 Kent’s Com. 205, 6, 219. Governor Seward’s Mess. to Senate, 20th March, 1840. 31 En. C. L. Rep. 159. Id. 376. 5 T. R. 278. 10 John. 242. 2 John. 375. Story’s Conflict of Laws, 44. 3 Russ. 1st Case. 3 Bur. 1436-7. 5 Paige Ch. Rep 605. 5 East, 223. 2 Sim. 35. 1 Jac. 254, notes (b) *71 and (c). 2 R. S. 80. 2 T. R. 268. 2 Ed. Ch. Rep. 498. 3 Paige, 36. 4 Con. En. Ch. Rep. 118, note (c). 1 Dow P. Ca. 84. 10 Ves. Jr. 1 Hag. Con. Rep. 35. 4 John. Ch. Rep. 187. 2 Paige, 501. 1 Ed. Ch. Rep. 290. 1 Paige, 276. British Jurist, 2 vol. 66. 2 and 3 Victoria, cap. 65. 1 Hop. Ch. Rep. 562 and 566.
IY. The whole case shews an illegal detention of the child under sanction of^the parental authority of Thomas R. Mercein; and it is a mere evasion to say there is no such detention, as the law defines that term,
Y. The judge erred in ruling that the proceeding of Thomas R. Mercien, after the chancellor’s adjudication, as evinced by the letters of the 28th and 29th Aug. 1839, did not amount to an illegal detention posterior to such decision. Those letters prohibit the father’s access to his child, contrary to all law, and are the very highest possible evidence of illegal detention. 2 Hag. Ec. Rep. 310. 4 En. Con. Ch. Rep. 140, 547,155, 379. 4 Paige, 516. 13 Johns. 418. 5 Bin. 520. 2 Ser. and Raw. 174. 6 Greenleaf, 463. 1 Dow. P. Ca. 81. 19 Wend. 20. 16 Pick. Rep. 203.
YI. The supreme court was bound not only to reverse the proceedings of Judge Inglis, but to render judgment according *to [ *92 J law, that the father is entitled to his child, and to have directed the delivery of the child to him accordingly. 2 R. S. 475, § 71. 1 Kent’s Comm. 423, 5, 9. 19 Wend. 16. 31 En. C. L. Rep. 153.
YII. The allegiance of the defendant in error to the Crown of England, and his place of domicil being abroad, beyond the sea, is no bar to the recognition and restoration of his legal rights as a father, his claim thereto being founded both on “comity,” and the “law of nations.” 2 Viner’s Abridg. Alien, a 2, § 6 and 21. Story’s Conf. of Laws, 33, 7, 44, 9. Gov. Seward’s Message to the Legislature in 1840. 5 East 221.
VHI. If the decision of the supreme court shall be affirmed, and the relator be declared to be entitled to the custody of his child, this court possesses within itself, the authority and power, on a writ of error arising out of a judgment, on a matter of habeas corpus, to grant him such process as is necessary to carry its judgment into full and immediate effect: and if the relator have it in his power to satisfy the court of the actual necessity of such measure, this court will grant him, instanter, such process accordingly. 2 R. S. 474, § 73, 2d Ed.
After advisement, the following opinions were delivered :
The Chancellor
did not deliver a written opinion; but observed that he would orally state the grounds upon which he considered it his duty to vote for the reversal of the judgment of the supreme court, for the affirmance of the decision of Judge Inglis to leave the child in the care of its mother. He *72 said that when this case was before him upon habeas corpus, in the court of chancery, in the summer of 1839, he had given the reasons why he thought the court in the exercise of its discretion, ought not to take the child from the care of its mother and give it to the relator. That the court or officer before whom the habeas corpus was returnable had some discretion on the subject, did not appear to be questioned at the time alluded to, and .[*93] he therefore did *not then examine that point very fully. It had, however, been argued at great length here, and the American cases' referred to, showed it to be the established law of this country that the court, or officer, were authorized to exercise a discretion, and that the father was not entitled to demand a delivery of the child to him, upon habeas corpus, as an absolute right. That this was also the law of England at the time of our separation from the mother country ; though, he said, the decisions of the English courts since that period, appeared to have gone back to the principles of a semi-barbarous age, when the wife was the slave of the husband, because he had the physical power to control her, and when the will of the strongest party constituted the rule of right. Thus in De Manneville’s case, 5 Hast, 220, the court of King’s bench refused to interfere, although a brutal husband had torn a child only eight months old from the breast of its mother, for the mere purpose of coercing his wife to give him the control of her property. Also in Skinner’s case, 9 J. B. Moore’s R. 278, the child was kept from its mother under the control of her husband and his mistress, with whom he was living in open adultery ; and yet the courts refused to interfere by habeas- corpus to restore the child to the innocent and much injured wife and mother. In both of these cases, however, the child was in the custody of the father, and it was the mother who sued out the writ to endeavor to induce the court to take that custody from him-. But in the susequent case of Greenhill, 4 Ad. and Ellis, 624, the children were in the custody of their mother, and the husband who was living in adultery with another woman, brought a habeas corpus and obtained an order upon his wife to deliver up the children to him, and the injured wife in that case, was, actually compelled to flee with her children to a foreign land, to obtain protection against the inhumanity and the immorality of what was then declared to be the English law. That it was in reference to this last case, that Lord Denman, C. J. of the court of king’s bench, who had concurred in the decision, in accordance with what he supposed the [ *94 ] recent cases had then settled as law, declared in the house *of lords, that the state of the law on this subject, was such as to make all the judges ashamed of it; and that Serjeant Taleobrd, to his everlasting honor, although he had been the counsel for the husband, immediately brought a bill into parliament to change the law, and to restore the mother to her natural right to be put upon an equality with her husband in relation *73 to the care and custody of her children within the age of nurture, and finally succeeded in carrying his bill through both houses of parliament, by a large majority; though it was once defeated in the house of lords.
The chancellor said he concurred in the decision of Judge Inglis, that the principle of res adjudicada was applicable to a proceeding upon habeas corpus ; and that it could make no difference in the application of the principle, whether the first writ was returnable before a court of record, or’ia judge or commissioner out of court, for in neither case ought the party suing out the writ to be permitted to proceed ad infinitum, before the same court, or officer, or before another court or officer having concurrent jurisdiction to review the former decision, while the facts remain the same; but if dissatisfied with the first decision, should appeal to a higher tribunal. That the habeas corpus in the present case presented the same question, except as to the res adjudicata, which was presented upon the writ returnable before himself at Saratoga Springs, in 1839. The previous writ issued by the recorder, was directed both to the wife and her father ; commanding them to bring up the infant child ; and both made a return to that writ under oath. But in the petition which was afterwards presented to himself as chancellor, the husband complained that his wife, as well as the child, were restrained of their liberty by the father-in-law, and the habeas corpus therefore, directed Mercein to bring up both. That the wife, upon a private examination, having declared it was untrue that she was in any way restrained of her liberty by her father, and that she was free to go where she pleased, and to take her child with her. The part of the complaint as to her illegal detention was dismissed of course, and the residue of the case was disposed of in the same manner as if the writ *'had directed the father-in-law to [ *95 ] bring up the child alone, as in the subsequent proceeding before Judge Inglis.
The chancellor further stated, that the proceeding before him was not before him as a commissioner, but was a proceeding on a writ of habeas corpus in the court of chancery, as a court of record. That the court of chancery, by the common law, had power to grant a writ of habeas corpus ad subjiciendum, which power was not taken away neither was it intended to be taken away by the Revised Statutes ; but the power of the court on such a writ was the same as that of any other court or officer authorized to grant a writ of habeas corpus. That it was not a proceeding on the equity side of the court, but on the common law side, and it was regulated by the provisions of the Revised Statutes on the subject; and that the order of the court upon such a writ, when issued by the chancellor, would have the same effect as the decision of the supreme court upon a similar writ, returnable in that court. That where a habeas corpus is issued by a commissioner or judge out of court, it must be under the seal of the supreme court; but *74 when issued by the chancellor it was issued by a court of record, which was always open, and must be under the seal of the court of chancery; and that by referring to the error-book in this case, it would be seen that the writ issued by him was under the seal of his court, and was made returnable “ before the chancellor in the court of chancery.” The final order made upon the return to that writ was, therefore, properly entered with the register of the court and became a matter of record.
The chancellor further observed, that the supreme court, in supposing that the . whole record should have been produced in evidence in order to raise the question of res adjudicate evidently overlooked the fact that this point arose upon the validity of the return as a pleading ; and was not a question of evidence. That the return of Mercein stated the issuing of the former writ, and the whole proceedidgs thereon; and this part of the return was not put in issue by an affidavit denying its truth, or otherwise. That Judge Inglis, therefore, was not called upon to examine as to the truth of the return, but merely to decide the question as to the effect of j- «gg j previous proceedings upon the supposition that they had taken place as stated in the return, and sworn to by the party making it. That if the prosecutor wished to question the truth of the allegations upon which the decision of the judge was based, he should have denied the fact that such proceedings had ever taken place.
The chancellor further observed, that the judge was right in refusing to take the child from its mother, as no new fact had occurred subsequent to the decision on the former writ, which had altered the state of the case or the relative claims of the parents to the custody of the child in any material respect; and that independent of the question of res adjudicata, the facts were such as to render the decision of the judge to leave the child in the custody of the mother a proper exercise of discretion under the circumstances of the case.
The chancellor further remarked, that his views as to the effect of the agreement between the relator and his wife in relation to the custody of the child, in case of their continuing to live separate, had been altered by the new lights which had been thrown on that subject during the argument in this court. That when the case was before him, he had considered the agreement as one which contemplated and provided for the care of a future separation merely, having overlooked the fact that the parties were then actually separated, and that they had been so from the time of the receipt of the relator’s letter repudiating his wife. That he was now satisfied the agreement was not void, upon the ground that it was an agreement which contemplated a future separation merely; that it evidently was based upon an actual separation existing at the time such agreement was made, and provided for the continuance of such separation, and the custody and *75 care of the children, if it should unfortunately happen that the existing difficulties could not be reconciled so as to put an end to the separation at a future day, although the agreement upon its face contemplated the possibility of such future reconciliation. That our laws had, to a limited exteiit, recognized the validity of agreements founded upon a present separation between husband and wife, ‘"where the parties could not live [ *97 ] together in peace. But that no agreement which derogated from the matrimonial rights of either party was valid while they continued to cohabit together ; and such agreements when founded upon actual separation, were of course rescinded when the parties became so far reconciled as again to live together. That the object of having a trustee for the wife, in an agreement for a separation, was to enable the trustee to enforce the agreement by suit, as the wife could not bring a suit in her own name upon such an agreement. That the case of Mary Mead, cited from the first volume of Burrows’ Reports, by the counsel for the plaintiff in error, seemed to be an authority for saying that the court, upon habeas corpus, would take notice of an agreement founded upon an actual separation, as controlling the marital rights of the husband ; and that the principle of that decision was equally applicable to the agreement made in this case, to relinquish to the wife the sole care and exclusive custody of the child during the continuance of guch separation, so far at least as to authorize the court upon habeas corpus, to refuse to take the child from her, contrary to such agreement.
The chancellor also said, that he thought the supreme court erred in supposing that the certiorari allowed by the provisions of the Revised Statutes to review the proceedings by commissioners under the habeas corpus act, was a mere common law certiorari, in which the court was only authorized to see that the judge or officer had kept within his jurisdiction. He said the statute evidently contemplated a review of the case upon its merits by the supreme court, and that if the justices of that court found that the judge, or other officer, had erred, they should not only set aside the erroneous proceeding, but should correct the error by proceeding to make such a formal decision in the case as he should have made, without compelling either party to commence de novo upon a new writ of habeas corpus ; and that, therefore, if Judge Inglis, upon the facts before him, was right in leaving the child in the custody of the mother, his decision should have been affirmed, but if he was wrong, the supreme court should not only have reversed Ms decision, but should also have proceeded to make a final disposition of the custody of the child, *or at least, should have remitted the [ *98 ] proceedings to the judge with directions to proceed to a final decision of the case upon the merits, in accordance with the principles which the supreme court had settled upon the certiorari. He, therefore, thought the *76 awarding of a new writ of habeas corpus returnable before another officer, was an erroneous proceeding under the provisions of the Revised Statutes.
By Senator Paige.
The facts of this case show that no such difficulty exists as is supposed by the learned judge who delivered the opinion of the supreme court, in relation to receiving as evidence the two affidavits of Mrs. Barry annexed to the returns to the writs of habeas corpus, returnable before the recorder and the chancellor, as these affidavits, and the facts therein contained, are expressly made by the defendant below a component part of his return. They are to be considered, therefore, as a part of the return, and consequently as a part of the record. It will be observed also that the relator interposed no denial under oath of any of the material facts set forth in the return, as authorized by the Revised Statutes, 2 vol. p. 471, § 50, 2d ed. The consequence of this omission is an admission of all the facts set forth therein, including those contained in the two affidavits of Mrs. Barry. At common law the return to a habeas corpus proves itself and cannot be contradicted. Bacon’s Abr. Habeas Corpus, B. 13. The Revised Statutes authorizes it to be contradicted by a denial under oath. But this denial the relator did not think proper to make. The result is, he admits all the facts set forth in the return to be true. He did not join issue thereon ; but placed himself upon the insufficiency of the facts in the return to justify the detention of his infant daughter, in like manner as if he had demurred to the same. And inasmuch as the relator omitted to make any new allegations under oath, as authorized by the Revised Statutes, he was not entitled to offer or introduce any evidence before the judge. This view of the case disposes of the objection (deemed so important by Mr. Justice Bronson,) that the petitions for the habeas corpus, and the other [ *99 ] papers before the recorder and the chancellor, were not *given in evidence before Judge Inglis. These proceedings are all set forth in the return of the defendant below ; and the return being admitted to be true, no evidence whatever of any of these proceedings was necessary.
Again: If the habeas corpus, issued by Judge Inglis, was as Mr. Justice Bronson asserts, a common law habeas corpus, and the proceedings were consequently removed to the supreme court by a common law certiorari, which only removed the record, the consequence supposed by the learned judge did not follow, viz: that the record showed no reasons for continuing the restraint, as the return, which forms a part of the record, embraces all the facts contained in the two affidavits of Mrs. Barry, (a fact not adverted to by the learned judge,) which it is insisted by the defendant below, show good reasons for the detention of the infant by its mother; and if the certiorari was a common law certiorari, as held by the supreme court, then cer *77 tainly, according to the doctrine of that court, it was not competent for it to reverse the decision of Judge Inglis—as the record shows no excess of jurisdiction, on irregularity of proceedings, and no error in deciding a mere question of law arising on the face of the record. The decision of Judge Inglis upon the question of restraint or no restraint, was a decision upon the facts, which the supreme court could not review upon a common law certiorari; nor even, according to the opinion of Mr. Justice Bronson, upon a statute certiorari.
But independent of these considerations, in my judgment, the decisions of Judge Inglis were correct, both upon the questions of res adjudieata and upon the merits.
The proceedings before the chancellor, and the order made by him, were between the same persons who were parties to the controversy before Judge Inglis, and were in relation to the same subject matter sought to be re-tried before that judge. This being so, according to adjudged cases, the proceedings before the chancellor were a bar to any re-investigation of any matters which occurred previous to the date of his final order. Such unhappy controversies as these may endure until the entire impoverishment or the death of the *parties, renders their farther con- [ *100 ] tinuance impracticable. If a final adjudication upon a habeas corpus is not to be deemed res adjudieata, the consequences will be lamentable. This favored writ will become an engine of oppression, instead of the writ of liberty. An examination of the cases on this subject will show that the general rule laid down by Chief Justice De Grey, in the case of the Duchess of Kingston, 11 State Trials, 261, as to the conclusiveness of a judgment of concurrent or exclusive jurisdiction upon the same matters between the same parties, is applicable to all final adjudication upon a habeas corpus. 1 Phil. Ev. 321, 333 ; 3 Cow. 127 ; 3 Wend. 38 ; 1 Starkie’s Ev. 206 ; Strange, 681: Doug. 407 ; 7 T. R. 367 ; 2 Bl. Rep. 1174; 1 Ridgeway, 43 ; 2 Cow. & Hill’s notes to Phil. Ev. 825 ; 6 John. 337 ; Yates v. People, 7 T. R. 451; 1 East. 537. I think the following rule will be found sustained by the cases, viz: wherever a final adjudication of an inferior court of record, or of an inferior court not of record, or of persons invested with power to decide on the property and rights of the citizen, is examinable by the supreme court, upon a writ of error or a certiorari,—in every such case, such final adjudication may be pleaded as res adjudieata, and is conclusive upon the parties in all future controversies relating to the same matter. Tidd’s Pr. 1051, 1138 ; 2 Caine’s R. 182; 20 John. 80.
It is insisted on the part of the plaintiff in error, that the agreement of the date of the 7th June, 1838, entered into between Mr. and Mrs. Barry, was a renunciation by Barry of his marital rights, or at least was a cession *78 to Mrs. Barry, for all future time, of the custody of the infant daughter of the relator. By that instrument, Barry agrees to relinquish to his wife all his right to the daughter, if she should require it. Agreements for a present separation between husband and wife are valid; otherwise as to agreements for & future separation. 3 Paige, Ch. R. 483; 8 Johns. R. 72; 2 Wen. R. 422. In Rex v. Mary Mead, 1 Burr. R. 542, (1758,) which was a habeas corpus to bring up the wife of John Wilkes, the return set forth, that her husband, (having used her ill) in consideration of a large [ *101 ] sum paid him out of. her ’"separate estate, consented to her living separate from him, and entered into articles of separation, and covenanted therein not to disturb her or any person with whom she should live ; that she lived with her mother at her own earnest desire, and that the habeas corpus was taken out with the view of seizing her by force. It was held by the court that this agreement was a formal renunciation by the husband of his marital right to seize his wife, or to force her to live with him. A similar decision was made in Rex v. Lister, 1 Strange, 478 (1722). In the matter of McDowles, 8 Johns. R. 328, where the father of an infant, and the master, executed indentures of apprenticeship, which were not binding on the infant, it was held that the father was nevertheless bound, and that the infant could alone take advantage of the defect in the indenture ; and being brought up on an habeas corpus sued out by the father, the court refused to deliver him to the father, but gave him permission to go where he pleased. Upon the authority of those cases, I am strongly inclined to the opinion that the agreement entered into between Barry and his wife, was in equity a cession by him to her of the custody of his infant daughter. But laying this agreement out of the question, in my opinion, the mother, under the facts and circumstances of this case, ought to be alowed to retain the custody of the daughter.
The father’s right to his child is not absolute and inalienable. In those American cases which uphold to the greatest extent the right of the father, it is conceded that it may be lost by his ill usage, immoral principles or habits, or by his inability to provide for his children. But the great principle which runs through nearly all the American and the earlier English cases, is that which is stated by Thompson, Ch. J. in the matter of Waldron, 13 Johns. 418, when speaking of the custody of the infant, in the case of the claim made by the father, to such custody, viz: “ It is the benefit and welfare of the infant to which the attention of the court ought principally to be directed.” - Asa necessary result of this principle, it follows that the custody of infant children must always be regulated by judicial discretion, exercised in reference to their best interests. Where an infant [ *102 ] is brought *up on habeas corpus, the court will not decide upon the right of guardianship, and if there is no improper restraint, *79 the court will not deliver over the infant to the custody of another. If the infant is competent to form a judgment and-declare his election, the court will after examination allow him to go where he pleases, otherwise will exercise its judgment for him ; and this judgment is to be exercised (being in lieu of the judgment of the infant) with reference to the interest and welfare of the infant. Matter of Wollstonecraft, 4 Johns. Ch. R. 80 ; Matter of McDowell’s, 8 Johns. 328 ; Matter of Waldron, 13 Johns, 418. The interest of the infant is deemed paramount to the claims of both parents. This is the predominant question which is to be considered by the court or tribunal before whom the infant is brought. The rights of the parents must in all cases yield to the interests and welfare of the infant. These principles were recognized and adjudged as a part of the law of this state, in the cases last referred to. And if the cases of The People v. Chegaray, 18 Wen. 640, and of Nickerson, 19 Wen. 16, conflict with these authorities, they are in my judgment, to the extent of such conflict, a departure from the law as established in this state. But even in the case of Nickerson, relied on by the relator, Nelson, Ch. J., admits the general rule above stated. He says, “ Nothing appears to show that the father is not a fit and .proper person to have the care and education of his child, or that it would be for the interest of the child pecuniarily or otherwise, to commit its custody to the mother.” It will be found that in a great variety of cases, courts have, in the exercise of a judicial discretion as to the custody of infant children, committed them to the custody of the mother, or of some third person notwithstanding, and in opposition to the claims of the father to such custody. Commonwealth v. Addicks, 5 Binney, 520 ; 3 Mason R. 482 ; 6 Greenleaf R. 462 ; 4 Johns. Ch. 80 ; 8 Johns. 253; 13 Johns. 418; the late case of the Commonwealth, ex. rel. D’Hauteville v. Sears and others, in the court of General Sessions in Philadelphia.
*By the law of nature, the father has no paramount right to the [ *103 ] custody of his child. By that law the wife and child are equal to the husband and father; but inferior and subject to their sovereign. The head of a family, in his character of husband and father, has no authority over his wife and children; but in his character of sovereign he has. On the establishment of civil societies, the power of the chief of a family as sovereign, passes to the chief or government of the nation. And the chief or magistrate of the nation-not possessing the requisite knowledge necessary to a judicious discharge of the duties of guardianship and education of children, such portion of the sovereign power as relates to the discharge of these duties, is transferred to the parents, subject to such restrictions and limitations as the sovereign power of the nation think proper to prescribe. There is no parental authority independent of the supreme power of the *80 state. But the former is derived altogether from the latter. In the civil state there is no inequality between the father and mother. Ordinarily a child, during infancy, is entirely under the discipline of its mother; and very frequently wives discharge the duty of education of their children better than the husbands. Be Felice, Lectures on Natural Rights—Lecture 30. It seems then, that by the law of nature, the father has no paramount inalienable right to the custody of his child. And the civil or municipal law in setting bounds to his parental authority, and in entirely of partially depriving him of it in cases where the interests and welfare of his child require it, does not come in conflict with or subvert any of the principles of the natural law. The moment a child is born, it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated by its duty of protection, to consult the welfare, comfort and interests of such child in regulating its custody during the period of its minority. By the civil code of Austria, where husband and wife are separated, and cannot agree which shall have the charge of the education of the children, the mother has the custody of males until they arrive at the full age of four years, and of females until the full age of seven years.
[ *104 3 *The law of England at the time of the American revolution and even until after the year 1800, in relation to the custody of infant children, was the sanie as I understand it to be in this state. In Rex. vs. Smith 2 Strange 982. (1735,) a boy of thirteen or sixteen years old, in the custody of his aunt, was brought up on a habeas corpus sued out by his father. It was held by the court, that they could only deliver the boy out of the custody of his aunt, and inform him he was at liberty to go where he pleased; and the boy chose to remain with his aunt. In the case of Rex. vs. Delavel, 3 Burr. 1434, decided in 1763, Lord Mansfield held “ that in cases of writs of habeas corpus directed to bring up infants, the court is bound ex débito justitice, to set the infant free from an improper restraint; but they are not bound to deliver them over to anybody, nor to give them any privilege. This must be left to their discretion, according to the circumstances that shall appear before them.” And in Blisset’s case, Loft’s Rep. 748, (1774,) Lord Mansfield says: “If the parties disagree, the court will do what shall appear best for the child.” It was not until 1804, in the case of The King vs. De Manneville, 5 East, 221, that the decisions in England took a direction in favor of establishing the paramount right of the father to the custody of his infant, in cases where the interest and welfare of the infant called upon the court to commit it to the custody of the mother. This case was followed by those of ex parte Skinner, 9 J. B. Moore R. 278 ; of McClellan, 1 Dowling, Prac. cases 81; of Ball vs. Ball, 2 Simon 35; of the King vs. Greenhill, 4 Ad. § Ellis 624, decided *81 gone, I refer to the speech of Lord Lyndhurst in the house of lords on the 30th July, 1838, on the bill in relation to the custody of infants, 44 vol. Parl. Debates, 3 Series, p. 774, he says: “ As the law now stood, the father of a child born in lawful wedlock was entitled to the entire and absolute control and custody of that child, and to exclude from any share in that control and custody the mother of that child. The mother might be the most virtuous woman that ever lived, amiable in her manners, fond and attached to her *children; the father, on the other hand, [ *105 ] might be profligate in character, brutal in manner, living in adultery, and yet would have the right, under the existing law, to the custody of the children of. his marriage, to the exclusion of even access to them of his wife, their mother.” Lord Denman, the chief justice of the queen’s bench, in a speech on the same subject in the honse of lords, on the 18th July, 1839, 49 vol. Parl. Debates, p. 494, says: “ In the case of The King vs. Greenhill, which had been decided in 1836, before himself and the other judges of the king’s bench, he believed that there was not one judge who had not felt ashamed of the state of the law, and that it was such as to render it odious in the eyes of the country. The effect in that case was to enable the father to take his children from his young and blameless wife, and place them in the charge of a woman with whom he then cohabited.”
If such was the state of the English law, Lord Denman might well say he was ashamed of it, and that it was odious in the eyes of the country. This state has never been disgraced by laws so subversive of the welfare of infant children, of the rights of mothers, and 'of the morals of the people. In 1839, through the untiring and praiseworthy exertions of Serjeant Talfourd, the British parliament modified the relation to the custody of infants, by an act which authorizes the lord chancellor and master of the rolls, to make an order for the access of the mother to her infant children, and if the infant be within the age of seven years, to make an order that it be delivered to and remain in the custody of the mother until attaining such age.
Upon a review of all the authorities binding upon the courts of this state, I have come to the undoubting conclusion, that the right of the father to the custody of his child is not absolute, and that such custody is referrable to its interest and welfare, and is to be selected by the court in the exercise of a sound judicial discretion, irrespective of the claims of either parent. This conclusion I believe is warranted by the law of this state, as well as by the law of nature. A sense of parental duty ought ever to withhold a parent from pressing, his or her claims to the custody of a *child, [ *106 ] whenever the true interests of such child forbid it; and whenever this parental obligation fails to influence the conduct of the parent, it is fortunate that the enlightened principles of our law authorize our courts to interpose in behalf of the child.
*82 If then a judicial discretion is to be exercised in relation to the welfare, comfort and interest of the infant, as connected with her custody, was this discretion improperly exercised in this case by Judge Inglis ? The infant was under three years of age ; was delicate and sickly, requiring peculiarly a mother’s care and attention. The mother possessed every qualification to bestow this care and attention. Ought the judge to have delivered this infant, under such circumstances, over to the father, or to have allowed it to remain in the custody of the mother ? I confess I have no hesitation in saying that I entirely concur in the position of the chancellor, viz : that all other things being equal, the mother is the most proper person to be entrusted with the custody of a child of this tender age. He says, “ the law of nature has given to her an attacnment for her infant offspring which no other relative will be likely to possess in an equal degree. And where no sufficient reasons exist for depriving her of the care and nurture of her child, it would not be a proper exercise of discretion in any court to violate the law of nature in this respest.” ‘ I am, therefore, in favor of reversing the judgment of the supreme court.
On the question being put, shall this judgment he reversed? nineteen members of the court answered in the affirmative, and three in the negative. The members answering in the negative, were, The President of the Senate, and Senators Root and Skinner.
A resolution was then adopted, that in the opinion of the court the decision of Judge Inglis upon the question of res adjudicada was correct, and in conformity to law.
Whereupon, a rule was entered reversing the judgment of the supreme court, and affirming the decision of Judge Inglis; in which rule was incorporated the resolution adopted as above.