## Case No. 13,785.

### TAYLOR et al. v. CARPENTER.

[2 Woodb. & M. 1; 10 Law Rep. 35; Cox, Am. Trade-Mark Cas. 32; Cox, Manual Trade-Mark Cas. 44; 9 Law T. (Eng.) 514.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1846.

APPEAL—CERTIFICATE OF DIVISION—EXEMPLIFIED COPY OF JUDGMENT—EVIDENCE—USAGE —DAMAGES—PARTIES—ALIEN.

1. The judges of this court, on a motion for a new trial, cannot certify to a division of opinion at the trial itself, unless both were present, and it will not it seems enable the parties to carry the case up, if certifying to it in respect to the motion for a new trial.

2. A document, attested by the clerk of a court, with its seal, and the certificate of its

[1] [Reported by Charles L. Woodbury, Esq., and by George Minot, Esq. 10 Law Rep. 35, contains only a partial report.]

presiding judge, and called an "exemplified copy," is competent evidence of the judgment described in it, under the act of congress—though it may not conform to the mode at common law, or in the state where the judgment was rendered.

3. The force and effect of the judgment itself, depends on other principles.

4. A witness may testify generally as to what accounts and results of sales were rendered to him, without their being produced; but he cannot give their respective contents without producing them, if called for.

5. Where an action is brought for a deceit in using the plaintiff's trade marks on defendant's goods; and selling them as and for the plaintiff's, evidence may be offered of any number of such sales, under a count for selling on a particular day, and divers others between that and the date of the writ.

6. Evidence in such a case of a usage abroad and in England to use such marks of others when aliens, with impunity, is not a competent defence to the jury, and such a usage being a bad one and not in existence here, cannot affect the law here.

7. It might be offered in mitigation of vindictive damages, if requested, and a long delay of the plaintiffs to prosecute after knowing the wrong, might be competent proof to show their acquiescence in it, but could be no absolute bar to a recovery, unless extending to the period of the statute of limitations.

[Cited in Cuervo v. Jacob Henkell Co., 50 Fed. 472; Menendez v. Holt, 128 U. S. 524, 9 Sup. Ct. 145.]

8. An alien friend can bring here, when injured, any personal action which a citizen can. And though he is not admitted to the same political and municipal rights, which citizens are entitled to, the protection of his person and property against frauds and wrongs is due, and is just.

[Cited in The Passenger Cases, 7 How. (48 U. S.) 532; La Croix v. May, 15 Fed. 237.]

9. When the marks to his goods are used by others, and sold by them on their goods, as and for his, it is a wrong, and he is entitled to recover to the extent of his damages by the loss of sales, and their profits.

[Cited in Hostetter v. Vowinkle, Case No. 6,-714.]

10. He is entitled to that extent, though the articles sold as and for his were not inferior in quality to his.

11. It is not a bar to such a suit that a remedy is not reciprocally allowed like this to aliens in the country to which he belongs.

12. Nor is the remedy in this case obliged to be pursued by taking out a patent for his marks under the patent laws.

13. Laws and pleas are to be construed more favorably to alien friends than formerly, when a low state of commercial intercourse and of civilization regarded almost all foreigners as barbarians, if not enemies.

14. The damages in such cases should be full, ample—but not vindictive or beyond what has been really suffered, and if the language used by the judge was "exemplary damages," and open to be construed beyond this rule, yet if the jury appear not to have gone beyond the actual injury sustained, the verdict will not be disturbed.

[Cited in Jay v. Almy, Case No. 7,236; Hull v. Richmond, Id. 6,861; Mason v. Crosby, Id. 9,236; Aiken v. Bemis, Id. 109.]

This was an action on the case, brought by the plaintiffs [John Taylor and others], citizens of Great Britain, against the defendant [Daniel Carpenter], a citizen of Massachusetts, for imitating and using from January, 1842, to January, 1845, in this state, the trade marks of the plaintiffs, on thread of the defendant, and selling great quantities thereof, as and for the plaintiffs' thread, to their damage in the sum of $20,000. The defendant pleaded the general issue, and at the trial here at an adjournment of the October term, 1845, a verdict was found for the plaintiffs for $800. [See note to Case No. 13,784.] The defendant moved the court to set aside this verdict, and to grant a new trial for the reasons assigned in a motion, embracing various alleged misdirections and omissions by Judge Sprague, before whom the case was tried.

The motion was argued at the May term, 1846, by Choate & Plympton in its favor and for Carpenter, and by B. R. Curtis against it and for Taylor & Co.

WOODBURY, Circuit Justice. Not being present at the trial of this cause, I am unable to decide how far the exceptions made, accord with what actually took place. But where the counsel differ upon that, as they do in some important particulars, it will be necessary to be governed by the minutes and recollection of my associate, who made the rulings complained of. In each case, after settling in that way the true extent of the exceptions, I shall offer my views on their sufficiency for obtaining a new trial. As there seemed to be a wish on the defendant's part to carry the questions raised in this case to the supreme court, and as some of the points are important and novel, I felt disposed to oblige the parties as far as might be proper by some arrangement under a division of opinion in the court pro forma for that purpose. See the usage in Jones v. Van Zandt, 5 How. [46 U. S.] 215. But after time allowed to counsel to make such an arrangement, and their failure to effect it, I do not feel authorized, when not present at the trial, to have a difference of views certified, as if there existing in order to enable the parties to carry the case to the supreme court, because such a difference was neither real nor possible. And if a difference should be formally certified as existing now, which is possible, neither party could probably carry the cause up, as it would be a difference on a matter resting, as a new trial does, in the mere discretion of the court. U. S. v. Daniels, 6 Wheat. [19 U. S.] 542; [M'Millan v. M'Neill] 4 Wheat. [17 U. S.] 213; [Henderson v. Moore] 5 Cranch [9 U. S.] 11; [Marine Ins. Co. v. Young] Id. 187; Lanning v. London [Case No. 8,075]. In this condition of things we are both compelled to examine the questions presented seriatim and with care, and if we divide, the motion will fail, and final judgment be rendered on the verdict. Such will, also, be the case if we agree against the

motion. While if we agree in favor of it, then the verdict being set aside and a new trial had, it may be possible, that if both judges are present, some division of opinion may occur, which will enable either side to obtain the decision of the supreme court upon it, but only in that event.

1. The first cause assigned for a new trial is, that the judge admitted a document to prove a bill and answer in chancery in New York, which was not legal evidence. The document offered here had the attestation of the clerk, and seal of the court, with the proper attestation of the presiding judge; and the copy is said to be "exemplified," which means, a true copy. Such a copy seems to me to be competent evidence of a judgment, under the act of congress of May 26, 1790 (1 Stat. 122). See Craig v. Brown [Case No. 3,328]; [Ferguson v. Harwood] 7 Cranch [11 U. S.] 408; [Mills v. Duryee] Id. 481; [Drummond v. Magruder] 9 Cranch [13 U. S.] 122; [Hampton v. M'Connel] 3 Wheat. [16 U. S.] 234. What force will be given to the judgment itself in another state depends on the expression in the law, that it shall be the same as in the state where it is rendered, and on the construction given to that law, and the constitution bearing on it in various cases, which have been decided. [Mills v. Duryee] 7 Cranch [11 U. S.] 481; [Armstrong v. Carson] 2 Dall. [2 U. S.] 302; Green v. Sarmiento [Case No. 5,760]; Field v. Gibbs [Id. 4,766]; Campbell v. Claudius [Id. 2,356]; [Mayhew v. Thatcher] 6 Wheat. [19 U. S.] 129; Serg. Const. Law, 388; [M'Elmoyle v. Cohen] 13 Pet. [38 U. S.] 312; [Walden v. Craig] 14 Pet. [39 U. S.] 147. The expression in the law does not relate to the force of the copy thus certified, because each state is of course to prescribe its own wishes and views as to what shall be good evidence in its own courts. But relating to the force of the judgment as just shown, it is a different question, and one which it is not necessary to discuss here, as the question concerning the force and effect of the judgment itself does not arise here, but may be seen as settled in the cases already cited. Conceding, then, that this copy is not such as is used in the New York state courts (2 Rev. Laws, p. 403); nor such as is usual at common law (2 Burrows, 1179; 4 Barn. & C. 85); yet it is such as the act of congress prescribes in such a case, and was, therefore, as before shown, properly admitted.

2. The second objection is, that a witness, Warburton, was allowed to testify as to the amounts of certain sales and receipts of thread for the plaintiffs, without producing the letters or accounts of sales, from which he derived the information. It seems, on examination, that the plaintiffs found a falling off in their sales; and the witness, who was an agent or correspondent, through whom orders and receipts passed, was questioned by the plaintiffs, to show the diminution of such sales. After doing it, on the cross-examination, he was asked by the counsel for the defendant, if some of this information was not derived from letters addressed to him and accounts rendered, and on his replying in the affirmative, the defendant objected to the evidence without a production of the letters and accounts. If this point ended here, I should think that the witness could not state in detail the contents of letters without producing them. When having named certain specific results, without its first appearing that they had been obtained from letters, but appearing so afterwards, I think that the statements should then be withdrawn, if due notice is given to produce the letters, and they are withheld. 1 Greenl. Ev. p. 403, § 84, note; Swett's Case, 2 Mass. 569; [Taylor v. Riggs] 1 Pet. [26 U. S.] 591–596. It is immaterial in my view, whether the facts as to his means of knowledge being from letters came out, on questions put by the defendant or the plaintiffs. But here it is said, that after such notice, and the letters not being produced, the statements were ruled out. That is the first answer to the objection. Again, it is said, that the witness did not state the special contents of any letters, but the mere results or general impressions derived from numerous letters and accounts rendered, and rather testified, that such letters and accounts were rendered, than detailed their particular contents. This may be permissible. 3 Camp. 310; Steph. N. P. 215; Peake, Ad. Cas. 83; 2 Starkie, 274; 1 Greenl. Ev. § 101; 1 Starkie, Ev. (Am. Ed.) 154. And as there is no reason to believe the results were not correctly stated, the verdict was not changed by the admission, and should not therefore be set aside for a mere technical doubt on this point, and the more especially, if the evidence was ultimately ruled out, as seems to be the impression on one side.

3. The third objection as to the orders, rests on the same foundation.

4. So does the fourth objection as to the aggregate of the sales during six years previous to 1843, derived from such letters and accounts.

5. The fifth exception is, that the court under an allegation of sales by the defendant, within a certain period; viz., on 4th of January, 1842, and on divers days between that and the purchase of the writ, (4th January, 1845,) allowed evidence to be given of several sales on different days within that period. But I am aware of no principle to prevent a recovery for several torts or wrongs of a like character, and on different days, in one count, if stating the times broad enough to cover all. 8 Went. Pl. 434; Webs. Pat. 111; 2 Chit. Pl. 765; Gould, Pl. 104. And though it is true, that where only one wrong is sued for, it may in such counts be shown to have happened on any one day within the time, there is nothing in this principle to forbid several trespasses on different days to be proved. On any different rule a separate

count might be required for every skein or spool of thread sold, amounting, as in this case, to many thousands of spools It seems to me, also, that a judgment under such a count would be prima facie a bar to any other suit for a sale within the time covered. And if so, then of course the evidence of any sales within the period is competent.

6. The sixth objection is, that the court excluded evidence of a general custom in the United States, England, Germany, and France, for the last twenty years, to use and imitate the marks of foreigners with impunity, and that such custom was generally known in the commercial world, and not contrary to the laws of such countries.

7. The seventh exception is similar to the sixth, except that the custom is to have the marks of aliens thus imitated, with a view to have the goods received and used there as if made by those aliens. In respect to these two objections, I am not aware of any principle, by which a usage in this or a foreign country is competent evidence in defence of a wrong. To be sure it may be weighed by a court in settling the law, if a usage existed here and was ancient and universal, as such an usage sometimes makes law, when there is nothing in it forbidden by the constitution or acts of congress. 1 Bl. Comm. 62, 75; 1 Hale, Com. Law, 1, 2; 1 Reeve, Eng. Law, 1; 3 Salk. 112; 1 Taunt. 241; U. S. v. McDaniels, 7 Pet. [32 U. S.] 15. A custom may be good, though against private rights (1 Law Rep. 217), and though against a bad by-law (1 Saund. 312, note; 7 Dowl. & R. p. 747). But usage cannot alter a law,—[U. S. v. McDaniels] 7 Pet. [32 U. S.] 15,—though it may be shown against those acquainted with the usage, and conforming to it, to show the law is rescinded, which might otherwise apply, as in case of notice of non-payment of notes. See Pierpont v. Fowle [Case No. 11,152]; Conkendorfer v. Preston, 4 How. [45 U. S.] 317. Again, this usage here was not offered to the court to prove what was law here or abroad, but to the jury; nor was it offered as an ancient usage, which is the gist of it, when affecting the law. Nor as one ever existing and tolerated in this country by judicial decisions. Nor offered to the jury in mere mitigation of damages, for which purpose it might be competent, so far as regards smart money, or any vindictive damage, if any such were permissible in a case like this. 2 Greenl. Ev. § 266. See Scott, N. R. 574–594.

The defendant now argues, that this evidence was competent to show an acquiescence by the plaintiffs, in the use of their marks, or to show a dedication of them to the public, as they knew that marks of theirs as well as others were used in this way, and without redress, in this country as well as abroad. On this he cites 5 Scott, 562; Bull. N. P. 30a; Wyeth v. Stone [Case No. 18,107]; 2 Greenl. Ev. § 250; 3 Barn. & C. 543; 8 Sim.

477. But I am not aware that a neglect to prosecute, because one believed he had no rights, or from mere procrastination, is any defence at law, whatever it may be in equity, —Wyeth v. Stone [supra],—except under the statute of limitations, pleaded and relied on; or, under some positive statute, like that as to patents, which avoids the right, if the inventor permits the public to use the patent some time before taking out letters. It will be seen, likewise, that the defendant had the benefit of this evidence under another head more appropriate. There is something very abhorrent in allowing such a defence to a wrong, which consists in counterfeiting other's marks or stamps, defrauding others of what had been gained by their industry and skill, and robbing them of the fruits of their "good name," merely because they have shown forbearance and kindness. A custom ought to be, at least, moral and reasonable in order to be upheld. Bac. Abr. "Custom," C. A party can hardly set up his own bad conduct or character in defence to an action, nor justify them when prosecuted, because they may not have been materially worse than those of some other persons. 15 Pick. 506. It is rather an aggravation to the plaintiffs, that many others have injured them as well as the defendant; and it is only an argument ad hominem to them, that in England an alien in a case like this cannot recover. (if such be the usage and law,) but cannot affect our own sense here of what is moral towards others, what is due to our own self-respect in punishing frauds, and what seems to be demanded from us, both by justice and law, however others may conduct in like cases.

The eighth objection is, that the court refused to instruct the jury that the plaintiffs could not recover, because citizens and residents of Great Britain, or foreigners. This seems to be the point most labored and most relied on. The first inquiry under this head is, whether the subject-matter here is one over which this court has jurisdiction, and can be prosecuted here at all by an alien friend. Being an action for a tort or wrong to a foreigner, gives to this court general jurisdiction. But being an action for a particular kind of wrong, an injurious deceit to the damage of the plaintiffs, practised here, though they live abroad, is said to give them no cause of action. It is not argued, that such conduct towards a citizen by another citizen may not have been held to be actionable, as many suits and legal proceedings of that kind have been sustained (25 Am. Jur. 273; Hopk. 347; Bell v. Locke, 8 Paige, 75; Thomson v. Winchester, 19 Pick. 214; Eden, Inj. p. 226; Knott v. Morgan, 2 Keen, 213; Day v. Binning, Coop. 489; Millington v. Fox, 3 Mylne & C. 338; 4 Barn. & Ald. 410; 4 Barn. & C. 541; Canham v. Jones, 2 Ves. & B. 218); but the counsel for the defendant question the soundness on which these cases have proceeded, and rely on Blanchard v.

Hill, 2 Atk. 484, in support of their views. But in Blanchard v. Hill, 2 Atk. 484, it was merely decided, that the court would not enjoin one tradesman from using the same mark with another, a generic one, "The Great Mogul." They admitted, as in Southern v. How, Poph. 143, it was decided right, that if one used the same mark "to draw away customers from the other," or, "to put off bad goods," or, "with any fraudulent design," it was actionable. Ransome v. Bentall, 3 Law J. Ch. (N. S.) 161; Gout v. Parkinson, 5! London Leg. Obs. 495; 8 Ves. 215. So Thomson v. Winchester, 19 Pick. 214; 8 Paige, 75; 4 Man. & G. 386; Sykes v. Sykes, 3 Barn. & C. 541, 5 Dowl. & R. 292. The law is to be deemed settled there as between citizens, that a suit lies for such a wrong, because it violates what one has appropriated and made profitable. It impairs public security also in the quality of the article. Scott, N. R. 573.

It has been recently held, that if the quality of an article, such as pork, sold under one's brand, is inferior, the maker of the brand is liable, and it is made expressly punishable or actionable by the French Code (B 3, tit. 2, § 4), to use another's mark. In the next place, in this country, proceedings have been sustained in favor of aliens, as to their marks, as well as citizens, holding, that the former have all the rights in such personal matters here, as citizens against forgery and deceit, and can resort to this court for their protection. Taylor v. Carpenter [Case No. 13,784]. Case in New York, same parties, and confirmed in court of errors on appeal, 1847. The solicitude has been such to remove any doubt on this point, that, in the largest commercial state in the Union, on the 14th May, 1845, an act was passed, not only forbidding the counterfeiting of marks on goods, but punishing it with imprisonment, and inflicting a like punishment on one who sells such merchandise with forged marks knowingly. See New York statute, May 14th, 1845. The exceptions to this position, as to the rights of foreigners, I take to be twofold, if no more. One is, that it is not reciprocal, no such right being granted to exist, and which may be prosecuted by our citizens in Great Britain where this plaintiff resides. But this might be a good reason for legislation by congress, not allowing aliens to have any rights, or to prosecute them in this court, unless they are reciprocal and allowed to our people in their respective countries. But no such discrimination has ever been made by congress, and no court could make it by mere construction, without an exercise of judicial legislation. The cannibal of the Fejees may sue here in a personal action, though having no courts at home for us to resort to. Another exception is, that the right to one's marks, if existing at all in foreigners, must be vindicated and prosecuted in conformity to the patent laws, and not by an action on the case like this, independ-

ent of those laws. In support of this, is urged the analogy from the decision in Millar v. Taylor, 4 Burrows, 2377, that if a common law right existed to the copy of a book, and to sue for violations of it, the interest given by the statute of Anne was a substitute or merger of the common law right, and no suit could be sustained except under the statute. See also, Phil. Pat. 91; W. Bl. 403. But it has been held here, in the cases before cited, that the action in this instance still lay at common law, though this point was, perhaps, not raised and pressed there so elaborately as here. Nor is it pretended, that the right of action here, as at common law, is expressly taken away by the statute. But if taken away, it is done merely by implication. I have no doubt the statute in this case meant to confer some benefit as to copyrights and marks on aliens, which the latter did not before possess, instead of stripping them of any old rights.

Our law as to the mere patents and copyrights seems to proceed on the ground, that at common law they did not exist. But here no claim is made for them or under them. It is made not for copying, but copying and selling as if the original, and thus is for deceit and fraud. The statute undertakes to confer patents and copyrights, when desired; and it was adjudged in Wheaton v. Peters, 8 Pet. [33 U. S.] 591, that no copyright, as by common law, existed here to a book. But any claims or rights, which did exist before in the manuscript, or in a mark, or for deception and fraud, remain untouched. This last right is like that to any particular tool or machine, made by an individual; and any injury to it, or deceit in relation to it, may be prosecuted as at common law. But a mere open and acknowledged copy or imitation of it might probably not be prosecuted, except under the statute. The statute confers such additional protection under a constitutional injunction, though with a more sparing hand on foreigners than citizens.

There is still another exception, which is urged to this right existing at common law in aliens. It is, that a trade mark may be regarded merely as a generic name, when it comes here from abroad; and that our people have a right to use any generic name for their goods which they please. Thus, that "James Fever Powders" are now rather a generic name to distinguish a certain chemical substance, than a mark of any individual in which he has a monopoly. See 19 Pick. 216. It is contended, that no property exists here in mere words or marks, and that they are unlike the good will in a trade or store for business. And it is further urged, that if a foreigner can obtain no redress in such a case, and a citizen might, he should not complain, and may remain at home, as in many things he is not allowed here all the rights and privileges of a citizen, and right not to be. He cannot by the constitution be president. He cannot in many states vote.

He cannot hold land in many, or take by descent, though in others he can. He cannot take out patents and copyrights in all cases, and under like rules with a citizen. He cannot own vessels here. He cannot engage in the coasting trade here. He cannot in the conflict of laws enforce some rights, in cases of discharges in insolvency, which citizens may. Story, Confl. Laws, 33, 415; Towne v. Smith [Case No. 14,115].

But an alien is not now regarded as "the outside barbarian," he is considered in China, and the struggle in all commercial countries for some centuries, has been to enlarge his privileges and powers as to all matters of property and trade. It was one of the grievances in Magna Charta, as well as the Declaration of Independence, that the naturalization of foreigners had been too much obstructed. So too heavy taxation of alien merchants was guarded against in Magna Charta, allowing them "to go, and come, and buy, and sell, without any evil tolts." 1 Stat. art. 30; Thomp. Charters, p. 55. It is hence, undoubtedly, that Montesquieu observed, "that the English have made the protection of foreign merchants an article of their national liberty;" and Thomp. Charters, p. 232, says, that once they enjoyed it even in war, "in common with the clergy and husbandmen, in order that those who prayed, ploughed and trafficked, might be at peace." For many years it has been held, that pleas of alienage are to be discouraged; and are a defence not favored in the law. 8 Term R. 71, 166; 2 W. Bl. 1326; 13 East, 332; 10 East, 326; 1 Bos. & P. 163, 170; 9 East, 321; Steph. Pl. 67; Society for Prop. Gosp. v. Wheeler [Case No. 13,156]. Even as long ago as the time of Lord Chancellor Justice Hale, he "saith, that the law of England rather contracts than extends the disability of aliens, because the shutting out of aliens tends to the loss of people, who, when laboriously employed are the true riches of any country." Bac. Abr. "Aliens," C, note; Went. Pl. 427; 2 Rolle, 94. An alien may bring an action for slander of his character. Bac. Abr. "Aliens" D; Yel. 198. And by 31 Hen. VI. c. 4, he may sue for any injury on sea or in the realm. Personal actions, being transitory, are not limited to any particular country. Story, Confl. Laws, p. 450; 3 Bl. Comm. 249. And "the laws of a sovereign rightfully extend over persons, who are domiciled within his territory, and even property which is there situate." Id. § 539. "And he may deem all in his limits as subjects, and legislate over them, as to contracts and property." Id. § 541. "Suits for trespasses to property, lie in the country where committed." Id. § 554. Though sometimes they are brought for injuries in unsettled countries, to person, but not to real estate, in the place where the offender is found. Camp. 180; 4 Term R. 503; Livingston v. Jefferson [Case No. 8,411]; Batture Case.

Here the wrong was committed, and the defendant found here. Our duties are such to redress wrongs to foreigners, that they are by the constitution allowed to sue in the United States' courts, so as to secure greater exemption from local partialities or prejudices against them; and a refusal of justice to them in judicial tribunals is one just cause of war. 4 Elliott, Deb. 167. The 11th section of the judiciary act [1 Stat. 78] confers the same power on this court to sustain suits where an alien is a party, as where a citizen is. Aliens may sue here as extensively as in the state courts. 19 Pick. 214. In Barry's Case, so notorious for eight or ten years past in both the courts of New York and of the Union, he, though an alien, has been allowed as to regaining the custody of his child from his wife and her connections, the same remedies and principles as are granted to citizens. Barry's Case, 2 How. [43 U. S.] 65; Mercein v. People, 25 Wend. 64; Barry's Case, 5 How. [46 U. S.] 103. An alien gets the right of protection, from his obedience, industry, and care while here, and the usefulness of his capital and skill employed here, when he resides abroad. In Story, Confl. Laws, § 565, he says: "It may be laid down, as a general rule, that all foreigners, sui juris, and not otherwise specially disabled by the law of the place where the suit is brought, may there maintain suits to vindicate their rights and redress their wrongs." 2 Bligh, 31; 1 Dow. & C. 169; 1 Clark & F. 333; 2 Sim. 94; 8 Barn. & C. 427; 9 Ves. 347; 4 Johns. Ch. 370; and [Bank of Augusta v. Earle] 13 Pet. [38 U. S.] 519, extends comity of suits to corporations out of a state.

A person from abroad suing in this country is to enjoy no greater nor less rights than citizens. "He is to have the same rights which all the subjects of this kingdom are entitled to." Lord Tenterden in De La Vega v. Vianna, 1 Barn. & Adol. 284; 2 Cow. 626; Willings v. Consequa [Case No. 17,767]; Courtois v. Carpenter [Id. 3,286]; 2 Johns. 345; [Wayman v. Southard] 10 Wheat. [23 U. S.] 1; Henry, For. Laws, 81–86. Foreign contracts, as well as laws, are respected and enforced only from comity, not proprio vigore, but almost invariably enforced. Story, Confl. Laws, § 244. Much more should we allow to persons protection and redress by comity, than to contracts and laws, made abroad, as we do daily, in every appropriate case. Alien merchants may not only sue for personal property, but, if resident in England, be allowed the benefit of their bankrupt laws. Bac. Abr. "Merchants."

The whole system of modern facilities for intercourse through consuls and ambassadors, through less rigid exclusions, through improved roads and steamships, through free trade and lower duties, and the greater brotherhood caused by the art of printing, the mariner's compass, and Christianity, all tend to connect nations closer, and equalize their rights and privileges in business. The progress of civilization and commerce, and the

whole character of our institutions and laws, are more and more friendly to foreigners, regarding them more as brethren, of one blood and origin, and hope, rather than barbarians and enemies. So as to permitting them to trade here, to sell and buy, to recover for conversions, or injuries, or sales of their property, to sue for frauds and deceits in relation to it as well as contracts, this has been the law ever since the constitution empowered congress to have courts to try suits, where an alien was a party, and ever since congress confirmed that power in 1789 in the circuit court. We, as well as the state courts, have yearly sustained alien friends in vindicating their personal rights, as fully as we do citizens, in all analogous cases. Courts, acting under the law of nations, as does the district court sometimes, and this one on appeals, are said to be less rigorous as to aliens than even common law courts. Crawford v. The William Penn [Case No. 3,372]. Indeed, by the very nature of our institutions encouraging emigration here and naturalization, and filling up our waste lands with the industrious of all nations, a more liberal course has always been entertained here in respect to foreigners than in England. Thus says Tucker: "An alien in America, antecedent to the Revolution, was entitled to all the rights and privileges of an alien in England, and many more; to all that an alien in England could claim." Again, "An alien in America was also entitled to many more rights than an alien in England." 1 Bl. Comm. pt. 2, App. 99, by Tucker.

The modern system of reciprocal treaties with foreign nations adopted by us, has, for a quarter of a century, been breaking down the barriers against aliens. The alien being a resident abroad, makes no difference in his right, or in our jurisdiction, if the subject-matter of the action arises here. If he is an alien, in order to give jurisdiction—[Breedlove v. Nicolet] 7 Pet. [32 U. S.] 413—he may reside either abroad or here. Again, the complaint here is not so much taking the mark of the plaintiff, as a generic or any other name, as it is selling the thread with such a mark as and for the plaintiffs. That is the gist of the wrong. That is a deceit and injury. See cases first cited, as to 2 Atk. 584. And I do not see why it is not one of those injuries to the personal rights and personal property of the plaintiffs, which, when committed here, should be redressed here in favor of alien friends, no less than citizens. We reprint, to be sure, foreign books, as Hallam's History, and put "Hallam's History" on the title-page. But we do not add to it the words, showing it to be a London, or Paris, or Dublin edition, and sell it as and for such. If we did, it would be reprehensible, and to be discountenanced. So in manufactures, we may strive to imitate the goods fabrics of other countries, or try to surpass them. That is one thing, and is commendable. But if we go farther, and adopt their peculiar marks, and sell our goods as and for theirs, we deceive and injure foreigners who owned them, and this, whether the fabric be of as good a quality or not. 8 Paige, Ch. 75; Blofeld v. Payne, 4 Barn. & Adol. 410. If it is inferior, we injure our own people also, in a pecuniary view, as well as in the moral tone of trade, and in national liberality. It is said, we are not bound to sacrifice our interests to promote those of others. Chit. Cont. 26. But that is a very different thing from taking what is valuable from them without acknowledgment or compensation. So we may be, it is said, "reasonably selfish." But we should not cheat, lie, and deceive to the injury of individuals, whether aliens or citizens.

Comity and courtesy are due to all friendly strangers, rather than imposition or pillage. Taking their marks and using them, as and for theirs, to their damage, is like preying on a visitor, or inhospitably plundering a wreck on shore. To elevate our own character as a nation, and the purity of our judicial tribunals, it seems to me we ought to go as far in the redress and punishment of these deceptions as can be vindicated on any sound principle. Some of the statutes, passed in what we consider a comparatively barbarous age, are not without admonitory lessons on this subject. Beside, one before referred to, the 9 Edw. III. St. 2, c. 1, empowers alien merchants to sell and buy freely any where, and to have redress if disturbed and damages. 1 Stat. 212. And 27 Edw. III. St. 2 cc. 18, 19, provides, that as such merchants "cannot often long tarry in one place, we will and grant that speedy right be to them done from day-to day and from hour to hour, according to the laws," &c. 1 Stat. 281. Again, in the 3d article of our treaty of 1794 with England, each power is authorized in America "freely to carry on trade and commerce with each other." So, we are under treaty obligations to Great Britain and most other European powers to admit their merchandise on favorable terms, and to allow their merchants to trade here as those of favored nations. But it would be a mockery of such provisions and engagements, if we prevented them from selling their goods after arriving here (Chief Justice Marshall in Brown v. Maryland 12 Wheat. [25 U. S.] 447); unless noxious to health or morals; or if we made onerous discriminations against them, or prevented their receiving the proceeds of their goods, or abstained from yielding protection against injuries to them, or to their marks. See Taylor v. Carpenter [Case No. 13,784]. I am not satisfied, then, that the judge at the trial did wrong in not charging on this point as desired by the defendant. Nor am I dissatisfied with the verdict in law or fact, in this respect.

9. The ninth objection is, that the judge did not charge, that the plaintiffs had forfeited their right to sue, if they knew for a long time these forgeries and sales, and did not sue. We have before shown, that there

is no legal principle to bar such a suit unless the delay to prosecute is equal ·to the time fixed in the statute of limitations, or as in patents, the inventor permits a public use so long, as by the express statutory provision, to be estopped.

10. The tenth objection is, that the judge did not instruct the jury, that it was competent to infer from certain depositions in the case, that the plaintiffs had abandoned their marks to be used by the public. But the further statement under this head, as to what the judge did charge the jury on this point, repels the idea that any error occurred. For he instructed them, that if the use was for such a length of time, and under such circumstances as to indicate a dedication or abandonment of the marks to the public, or a license to use them, the plaintiffs could not recover. This accords with the views in Wyeth v. Stone [Case No. 18,107], and Pidding v. How, 8 Sim. 479.

11. The eleventh objection is, that the court did not instruct the jury, that if the thread made by the defendant was not inferior in value to the plaintiffs', the latter ought not to recover. I concur in the judge's views, that it was no defence as to the plaintiffs' injury; as the defendant could not have sold his thread so extensively, and thus lessened the plaintiffs' sales, without accompanying it by the mark of the plaintiffs', which had obtained an established reputation. The public might not have so much reason to complain if they got as good an article. They would, however, run more risk, not having the guarantee of goodness, which they expected, as Taylor's forged name and mark were palmed on them for the genuine. 4 Barn. & Ald. 410; 3 Barn. & C. 541; 4 Man. & G. 179. Nor would they have the remedy against the plaintiffs, which they otherwise might have if the article proved inferior to what had been sold under the genuine brand. To be sure the plaintiffs, in their declaration, aver, that the thread sold by the defendant was inferior in quality. But the proof of this is no condition precedent to recover damages for the loss of sales, though it would be to recover damages for loss for any injury to the character of their thread. Not proving that last injury, they did not recover for it, but proving large sales by the defendant as and for the plaintiffs, they proved a probable loss of such sales by themselves, and ought to recover for that, as they lost the usual profits on sales to that amount. Blofeld v. Payne, 4 Barn. & Adol. 410.

12. The next objection was, that the plaintiffs, in such last case, should recover only nominal damages. But the actual damage, suffered by loss of sales by the plaintiffs, which was the ground of recovery, was just as great as if the thread had been inferior, though the credit of their mark and thread might not suffer so much thereby, if it did at all.

13. The next objection conveys an idea not exactly correct, as the judge informed the jury, that though a large dealer buying of the defendant, might know or be told that the mark was imitated, yet if the defendant knew the thread was to be sold again at retail, without giving that information, and it was so sold, the plaintiffs should recover. This was undoubtedly right; for the defendant was thus accessory to the eventual sales of the thread, under a forged stamp as if a true stamp; and he thus took the profits of sales, which would otherwise have gone to the plaintiffs and their agents. 3 Barn. & C. 541; 5 Dowl. & R. 292.

14. On the question of damages, however, in respect to giving "exemplary" ones, there is some doubt, whether the charge was in the exact form deemed proper under modern analyses and decisions on this point. 3 Am. Jur. 287–308, by Metcalf; 2 Greenl. Ev. §§ 266–272; 19 Pick. 216; Wilson v. Turner [Case No. 17,845]. That the jury should have given more than nominal damages, I have no doubt, and I have as little doubt that there were materials enough in the case, from which to estimate actual damages, such as the probable extent of sales by the defendant under these marks, and the loss of sales and profits therein by the plaintiffs. The jury would, in a case like this, if a known and deliberate imitation, often renewed and very prejudicial to the plaintiffs, not be very nice in their data and inferences, but be sure to give enough to cover all losses, and prove an ample indemnity. 2 Maule & S. 77; 13 Conn. 320; 6 Cow. 254; 7 Mann. 251. Not "smart money," or "vindictive damages," but full atonement for the wrong done. 8 Car. & P. 7; 7 Man. & G. 1033; 5 Watts, 375; 5 Taunt. 442. In a case like this, if in any, no reason exists for giving greater damages than have actually been sustained, or what have been called compensatory. Tracy v. Swartwout, 10 Pet. [35 U. S.] 81. There is nothing peculiarly atrocious in the conduct of the defendant, to be punished by damages, and in no other way, as a public example, considering the blamable usages which exist on this subject. So in very corrupt or flagitious wrongs, if a criminal prosecution lies for the public offence, I do not see much justification for what are called vindictive damages there, or smart money in the civil suit, as the criminal one covers them. Sinclair v. Tarbox, 2 N. H. 135. Yet what may be allowable in other cases it may not be proper to decide here, but leave them to be considered when those of a different character from this occur. See Sedg. Dam. 39; 2 Greenl. Ev. §§ 253–256, and books before cited; Sanborn v. Neilson, 4 N. H. 501; Whipple v. Walpole, 10 N. H. 130. If here, by "exemplary damages," the judge meant a full indemnity for the individual wrong in every equitable view, and thus, by such an example, operating in a preventive manner

the more effectually against a repetition of such injuries, then no error happened on his part. So, if he, in the hurry of the trial, used language which the jury were likely to construe as going beyond that range of indemnity, yet, in point of fact, the jury did not give more than was sufficient to make the plaintiffs whole, but rather less than that amount; this state of things does not seem to constitute a good ground for a new trial.

· It would be idle and worthless, even to the defendant, to have another trial, with no probability of lessening the amount of the verdict. My associate, who tried the cause, entertaining this opinion as to the verdict for $800, and seeing nothing myself which is apparently exorbitant in that sum, I do not feel justified in disturbing it. Wiggin v. Coffin [Case No. 17,624].

SPRAGUE, District Judge, expressed his concurrence in this opinion.

New trial refused, and judgment on the verdict. ·