Ranney, J.
We find no difficulty in arriving at the conclusion-that the probate judge erred in rejecting the evidence offered by the defendant in error, and that the court of common *pleas decided correctly in reversing his judgment. The controversy arose-between the parents of a female child, four and a half years of age,, who are living in a state of separation, as to the right to its custody.
The proceeding was instituted by the father against the mother- and her parents, in whose custody the child then was. After giving evidence tending to show that his wife left him without cause, and was living unjustifiably separate from him, and that he was an 'industrious man, of good habits and moral character, with abundant means to provide for and educate the child, and in every way suitable to have its custody, the relator rested his case. The respondents then gave evidence of their entire fitness for the discharge of the same duty, and of their willingness and ability to-perform it. The relator, in reply, made what must be considered *618 ■exceedingly liberal offers, to show their utter unfitness to have the custody and training of the child, either with a view to its present safety or future welfare. This evidence was rejected by the court, upon what ground we are left to conjecture; but we suppose it to have been for the reason that it should have been given in the first instance, and could not properly be received in reply. This, we think, an application of strictnesss at the wrong time, and in the wrong place. In one view of the law, it is true, the evidence was unnecessary; but this same view shows the judgment, awarding the child to the custody of the mother, erroneous, while the claims of the father remained 'unimpeached. But if a more liberal view is taken, and the claims of the mother are placed upon a perfect -equality with those of the father, it was equally wrong to have foreclosed inquiry as to the qualifications of either. Whatever difference of opinion may have obtained upon other points of this interesting and important subject, it is universally agreed that neither of the parties has any rights that can be made to conflict with the welfare of the child, and that the order of the court should be made with a single reference to its best interests. The contending parties maybe fairly presumed to be more solicitous to gratify *their own interests and feelings, than to develop the whole truth, with a view to the main object of the inquiry; while the child, incapable of judging for itself, and wholly unrepresented in the contest, is in danger of being overlooked. Under such circumstances, it is the duty of the judge to become its protector, and not ■only to listen to all the evidence produced by the parties calculated to throw light upon his path of duty, but also to inform himself from all other legitimate sources, the better to qualify himself to discharge understanding^ the delicate trust.
The rules which regulate the order for jmoducing proof, are rather rules of practice, intended to facilitate the transaction of business, than of evidence, and are never adhered to with unyielding tenacity when they would defeat the ends of justice. It is, however, by no moans certain that any departure from these rules was proposed in the present case. After the husband had given evidence tending to show the wife wrongfully separated from him, and of his entire fitness to have the custody of. the child, it would be going a great ways to say that the wife could retain it without .any evidence of qualification on her part, or giving any reason, «connected with the interests of the child, why it should remain in *619 her custody; and if she was bound to give such evidence, his right to rebut it can not bo questioned. But whether this was so or not, or whether the evidence might or might not have been rejected in an ordinary trial, we feel no hesitation in saying that such strictness can not bo indulged in a proceeding partaking more of the character of an inquest than of a trial, and that the judge has no right to disable himself, by the intervention of any technicality, from hearing everything necessary to an enlightened discharge of his duty.
Another question of very considerable importance, and no little difficulty, may arise in the further progress of the case; but as it is not now necessarily involved, I do not propose to examine it fully.
When husband and wife are living in a state of separation, *and each is equally well qualified, in every resjtect, to be intrusted with the custody and training of their infant children, should a court ever interfere, upon habeas corpus, to change the possession from the one to the other ?
This question can only relate to children of such tender years as to be unable to elect for themselves; since, in other cases, it is well settled, that the court will go no further than to relieve them from all improper restraint. Rex v. Deleval, 3 Burr. 1434; Matter of Wallstonecraft, 4 Johns. Ch. 81. This subject was most elaborately considered, in the celebrated Barry case, by the courts of New York. It first made its appearance in the court of chancery in 1839 (8 Paige, 47), where it will be found reported under the title of The People v. Mereien. The child (a female of delicate constitution) was then but twenty-one months old, and was in the custody of the mother, at her father’s bouse. There were two children of the marriage; the eldest (a boy) was already in the custody of the father, and this writ was prosecuted by him to obtain the custody of the other. Both the parties were highly respectable, and with abundant means to provide for the child. The chancellor, without expressing a definite opinion as to the legal rights of the father, in case the child could with safety be taken from the mother, arrived at the conclusion, that its tender age required the attentions of the mother, and that its safety and welfare were best promoted by having the custody with her.
This decision was made in August; and in October following, the relator prosecuted another writ before Judge Inglis, of the common pleas of New York, which, upon hearing, was dismissed; *620 the judge holding, that the proceedings before the chancellor were a bar to the further prosecution, as to matters in difference between the parties up to the time that order was made, and that nothing had since transpired to change-their rights. These last proceedings being removed into the Supreme Court, the order of Judge Inglis was reversed. 25 Wend. 64.
Bronson, J.,
in delivering the opinion of the court, seems to *have waived the question as to whether the matter was res ad judicata, up to the time the chancellor’s order was made; but he held the judge to have erred in applying it to a writ afterward brought, and for a continued detention of the child. Upon the merits, the opinion of the court was clearly with the relator. Admitting,'to the fullest extent, the right of the court, in the exercise of a sound legal discretion, to have regard to the welfare of the child, in determining the question of custody, they nevertheless insist, that the father, when no such consideration intervenes, “if he chooses to assert his right, has the better title to the custody of their minor children.”. The judge says: “I deém it well settled, that in the absence of any positive disqualification on the part of the father, for the proper discharge of his parental duties, and when there is no other special reason, touching the welfare of the children, for preferring the mother, the father has a paramount right to the custody, which no court is at liberty to disregard.” . . . . “ In short, the claim of the father is preferred, until it plainly appears that the interests of the children require it to be set aside.”
Upon a writ of error prosecuted in the court for the correction of errors, this judgment was reversed by a nearly unanimous vote, and the order of Judge Inglis was affirmed. 25 Wend. 83.
Only the chancellor and Senator Page delivered opinions; and while the former, when the case was before him in chancery, avoided the expression of a decided opinion upon the question I am now considering, he here very plainly indicates his non-concurrence in the doctrines advanced in the Supreme Court; and the latter, in an able opinion containing an extensive review of the authorities, thus states his conclusions:
“ Upon a review of all the authorities binding upon the courts of this state, I have come to the undoubting conclusion that the right of the father to the custody of his child is not absolute, and that such custody is referrable to its interest and welfare, and is *621, 622 *to be selected by the court, in the exercise of a sound judicial discretion, irrespective of the claims of either parent. This conclusion, I believe, is warranted by the law of this state, as well as by the law of nature.”
But this disagreeable (I might almost say unnatural) contest did not stop here. In 1842, the father prosecuted another writ in the Supreme Court, and that court still adhering to its former opinion, and regarding the judgment of the court of errors to have been founded alone upon the question of res adjudicata, by the concurrence of two judges against one, ordered the child restored to him. 3 Hill, 400.
A majority of my brethren think the law correctly stated by the Supreme- Court of New York. I must hear further before I am prepared to come to this conclusion. It rather seems to me, that no active interference between father and mother is allowable, unless the good of the child demands it; and that, as a court would not take from the mother and commit to the custody of the father a child capable of electing, against its consent, it ought not to do it by an exercise of its judgment for one incapable, unless it is plainly seen that the welfare of the child will be thereby promoted. Whatever may be the rights of the father, in a claim for guardianship, or in a common-law action against third persons for harboring the child, I do not think that the custody of the mother of her infant child can be said to be either improper or illegal, so as to authorize the employment of the habeas corpus. The right of the father to the custody and services of his child are founded upon the correlative duty of supporting and maintaining it; but when this duty is assumed and discharged by the mother, both parties are remitted to their natural rights, as the authors of its being, and stand upon a footing of perfect equality.
While all will agree that a mother of unexceptionable character' should not be deprived of the custody of a very young child, I can not believe that, because she may have reared it until others can bestow the necessary care and attention, it can be taken from her, *and the feelings of both mother and child disregarded, for no better reason than that it is the sovereign will of her husband to do so.
The New York court, I am aware, is more than sustained by some recent English decisions; but there is very little in them to recommend them to adoption elsewhere. In the case of the King v. Man *623 neville, 5 East, 221, the court of king’s bench refused to interfere in behalf of a mother, from whom a child but eight months old and at the breast, had been taken by violence by the husband; and in •Skinner’s case, 9 Moore, 278, where an infant child was kept from its mother, under the control of her husband and his mistress, with whom he was living in open adultery, all relief was denied. In the King v. Greenhill, 4 Adol. & Ell. 624, the children .were in the custody of the mother, and upon the application of the father, who was living in adultery with another woman, were ordered to be delivered over to him. It was this case which called forth the eloquent denunciations of Chancellor Lyudhurst, in which he declared, that in the then state of the law, however virtuous and amiable the mother might be, and however brutal and profligate the father might be, the right of custody would nevertheless belong to him; and which led Lord Denman, who, as chief justice of the king’s bench, had concurred in the decision, in a speech in the house of lords, to declare that “ he believed there was not one judge who had not felt ashamed of tho state of the law, and that it was such as to render it odious in tho eyes of Jhe country.” The evil became intolerable ; and parliament finally interfered, and passed an act restoring the mother to her natural rights, to be put upon an equality with her husband, in relation to the care and custody of her children, within the age of nurture. I am strongly disposed to think that the learned chief justice mistook a judicial excrescence upon the law, for the law itself, and that parliament did little more than restore it to its former condition.
The judgment must be affirmed.