SUPREME COURT.   At Chambers, New-York, September 9, 1857.
Before *Peabody*, Justice.

## THE PEOPLE *v.* EMMA AUGUSTA CUNNINGHAM.

The action of a committing magistrate is not final on the question of admitting
to bail.

Where the crime charged and the circumstances are such that a bail bond will
afford reasonable assurance that the accused will appear to stand trial, it is
his right that the bond should be accepted in lieu of his personal detention.

The right to detain for trial, being a restraint upon personal liberty, is limited
to the necessities of society, and when other adequate security can be had
the necessity for personal detention does not arise, and a resort to it is not
warranted by law, but is illegal, unjust and oppressive.

In determining whether such security would be adequate, it is necessary to
consider the nature of the offence charged, the probabilities of conviction,
the penalty to follow it, and the position, sex, social and family relations,
and pecuniary means of the accused.

What constitutes the offence of fraudulently producing an infant, falsely pre-
tending it to have been born of parents whose child would be entitled to
inherit property, with the intent of intercepting the estate, as described in 2
Revised Statutes (*p.* 676), discussed, on deciding to admit a person accused
of such felony to bail in the sum of $5000.

THIS cause came before Mr. Justice Peabody, at chambers,
on *habeas corpus*, issued on the application of the defendant,
for the purpose of having the defendant admitted to bail.
The facts are fully stated in the opinion of the judge.

*L. S. Chatfield*, for the defendant.

*A. Oakey Hall* (District Attorney), for the people.

PEABODY, J.—The prisoner is before me on a writ of
*habeas corpus*, addressed to John Gray, warden of the city
prison, asking to be admitted to bail.   The return to the
writ shows that she is detained in prison by virtue of a com-
mitment by a police justice, on the charge of "having felo-
niously and fraudulently produced an infant, falsely pretend-
ing it to have been born of parents whose child would have
been entitled to a share of the personal estate, and to inherit

the real estate of Harvey Burdell, deceased, with the intent of intercepting the inheritance of such real estate or the distribution of such personal property from the persons lawfully entitled thereto."

Annexed to said return is a statutory writ of *certiorari*, on which is written a discharge of the writ, by Judge Daly, of the Court of Common Pleas. That writ is addressed to the clerk of the Court of General Sessions, commanding him "to certify to Judge Daly the day and cause of the imprisonment of Emma A. Burdell, and the preliminary affidavits, &c., of William S. Davison, one of the police justices," &c.

Annexed to this writ is the return of the clerk to whom it is addressed, in substance that he had no personal or official knowledge of the day and cause of imprisonment of the said Emma A. Burdell, but that he returns certain affidavits against her on a charge of felony, which have been certified to the Court of General Sessions by the magistrate taking the same. The affidavits referred to in the return are not annexed, and do not appear before me. There is also annexed to the writ of *habeas corpus*, as if a part of the return to it, an extract from the minutes of the clerk of the Court of General Sessions, stating that a motion was made in that court to admit the prisoner to bail on the 12th day of August, 1857, which was denied.

These papers, the writ of *certiorari* and the return, and discharge indorsed, and the extract from the minutes of the Court of Sessions, are annexed to and seem to form a part of the return of the warden of the city prison to the writ of *habeas corpus* on which the prisoner is brought before me.

The prisoner answers to the return by interposing a traverse, and claims that she is illegally detained; and, to show this, she sets forth a copy of the proofs before the magistrate, so that the case presented to him is before me.

A motion is made on behalf of the people, that the *habeas corpus* be discharged, on the ground that the question of bail is *res adjudicata.*

First. That the magistrate, before whom the examination was had, refused to admit to bail.

Second. That the same question was decided adversely to the applicant, by Judge Daly, on the writ of *certiorari*.

Third. That a motion has been made in the Court of Sessions for the same purpose, which has also been denied.

As to the proceedings before Judge Daly, there is nothing before me to show that the question of admitting to bail was ever passed upon, discussed or raised there, even assuming all the papers before me as a part of the return of the warden of the prison to be properly here, proving their own genuineness and establishing all the facts stated in them. The papers returned to Judge Daly, on that writ do not appear before me, nor is there contained in his discharge any intimation of what was done before him. The more appropriate office of the writ of *certiorari*, in such case, is to revise the proceedings before the magistrate, and see whether any error in law was committed by him, and particularly whether he had, properly, jurisdiction of the matter. It is not usually resorted to alone for the mere purpose of moving to admit to bail; and I doubt if it has been deemed the appropriate writ for that purpose, except when issued with and in aid of the writ of *habeas corpus*, which it was not in that case. I cannot therefore infer, from the fact that a writ of *certiorari* was issued, and afterwards discharged by him, which is really all that I have any evidence was done, that the question of bail was raised and decided on that occasion; much less can I assume that, either before him or the Court of Sessions, the question of admitting to bail was presented and decided on the same state of facts as presented before me, which must have been the case to constitute it an estoppel, on the ground that the question was *res adjudicata.*

Estopples are not favored in law, and the party seeking to avail himself of one must set forth all the facts necessary to establish it. On the part of the prisoner, it was denied

most positively that either of those learned judges did examine and pass upon that question; and certainly the papers before me fall far short of setting forth the facts in a manner sufficiently full and definite to authorize me to adjudge that they did. The extract from the minutes of the Court of Sessions does not show on what papers or facts the motion was made, and it is conceded practically that the person of the prisoner was not before either of those judges to give jurisdiction of her person.

A motion was made on behalf of the prisoner to have all the papers returned by the warden of the city prison, except the commitment, stricken from the record as not being properly there, and I think it should be granted. (2 *R. S.*, 799, § 47; *Bennae* v. *The People*, 4 *Barb.*, 31; *Mercien's case*, 25 *Wend.*, 48–82, 84; 3 *Hill*, 416; 25 *Wend.*, 78–90.) If they are admissible at all, they are not so as a part of his return. They should have been introduced on behalf of the people. But they are probably not admissible at all under the objection by the prisoner. If Judge Daly, or the Court of Sessions, having jurisdiction of the matter and the person, entertained a motion for bail on the facts shown before me, and made an order dismissing it, a properly certified order or copy of the order showing the facts would be competent evidence of them and of the judgment thereon; but these papers are not proper evidence of it, and if allowed to stand as a part of the return of the warden they are not sufficient to establish the facts claimed, in the face of the denial of it by the prisoner. No other evidence that it did occur having been offered, I presume no better or further evidence can be given. If the decision by the committing magistrate and those made subsequently were, as is claimed here, final in their nature, then was the question already *res adjudicata* when it came before Judge Daly, and it had been twice finally adjudicated when afterwards it came before the Court of Sessions, and on the same principle it was finally adjudged there for the third time. It is

not pretended that in either of those cases the consideration of the merits was refused on the ground that the prisoner was estopped by the previous decisions. On the contrary, it is insisted by the prosecution that the question was decided on its merits on both and all occasions. If each of these decisions was in its nature final, the principle on which I am asked to dismiss this writ has been already twice violated in this case, which I am slow to believe.

The action of the committing magistrate is not final in its nature, and there is not before me any sufficient evidence that the question, as presented here, has ever been judicially determined by any other court or officer having jurisdiction to pass upon it, and I am bound to entertain the motion on its merits.

These preliminary objections being disposed of, it remains for me to decide whether this is a proper case for bail, and, if so, to fix the amount of bail proper to be taken. Is this a proper case for bail? Society has a right, when a crime has been committed, to punish the author of it, and, for that purpose, when facts are shown which indicate with a reasonable degree of probability that any certain person is guilty of it, it is the right of society to have such person properly brought to trial, that his guilt or innocence may be ascertained.

For the purpose of securing his presence for trial, and, if convicted, subsequently for punishment, he may lawfully be restrained of his personal liberty and detained in custody, unless he elect to give such pledge as affords a reasonable security that he will appear at the time and place fixed for trial. Such reasonable security for the appearance is all that society has a right to in that respect; and when the crime charged and other circumstances are such that a bond will afford reasonable assurance that he will appear to stand trial, it is the right of the accused that the bond should be accepted in lieu of his personal detention for the time. This is the law of our land. It is consistent with reason and

The People *v.* Cunningham.

humanity. It answers all the necessities of society, and with the least amount of privation to the individual consistent with the paramount right of society.

The right to detain for trial by a restraint of personal liberty is limited to the necessities of society; and when other adequate security can be had, the necessity for personal detention does not arise, and a resort to it is not warranted by law, but is illegal, unjust and oppressive. What are the rights of society and what those of the individual in this case? Will a bond in a pecuniary penalty afford reasonable security that the accused will appear in compliance with it and submit herself to trial? The forfeiture of such a bond would merely give to the state the amount of the penalty in money, which would not afford compensation for a failure of justice; and, in examining this question, I am to look chiefly, if not entirely, to the probability of its answering the end of rendering her appearance sure. In determining whether such security would be adequate, the circumstances of the case must be considered. Prominent among them are the nature of the offence charged and the penalty to follow upon conviction. And first, as to the nature of the offence: what amount of odium would attach to a conviction of it? The production of a child, falsely pretending it to be born of parents whose child would be entitled to property, with the intent to divert such property from the legal channels of descent, and thereby defraud those who are legally entitled to it; an attempt, by the production of a fictitious heir, to defraud real heirs of their legal rights; an attempt, by one grand falsehood, sustained by numerous other untruths, to deprive persons of property to which they are legally entitled; this seems to suggest the moral grade of the offence, which should determine the measure of odium to be visited upon a conviction. Next, what is the legal penalty to which she is exposed? This is imprisonment in the state prison for a term "not exceeding ten years." The medium between the greatest and the least

amount of punishment allowed by law would be five years' imprisonment, and this is certainly sufficient to make one shrink from exposure to it, and seek to avoid it with no little zeal, and without regard to small sacrifices. A delicate woman, especially, must be supposed to look with horror at the possibility of such a result. Next come the probabilities of conviction; and all experience has shown that this consideration is usually the most prominent in the human mind, in determining the amount of sacrifice to be made and hazards to be encountered for the sake of avoiding a trial. The prospect of any term in state prison is usually esteemed by the accused of vastly more consequence than the extent of the duration of that term. The mind shrinks from contemplating at length what is to follow after entering that sepulchre,—the progress of time, the revolution of the seasons, the succession of events in that other world,—and, for most purposes, limits its survey to the yawning portals, the approach to them, and the moment at which they are to be passed. The chances of conviction, then, are of the first importance in calculating the probability of one's appearance for trial in compliance with a bond. The facts in this case, as presented by the prosecution, are, that the accused, after feigning pregnancy for sufficient time, was found in her chamber, in the night, in bed, having by her a child of which she affected to have been recently delivered, and which she said, when asked by some visitors, was the offspring of herself and Dr. Burdell. She had previously claimed to be the wife of Dr. Burdell, who was then deceased, having left a considerable estate, which, if she were his wife and this were their child, it would be entitled to inherit. The intent on her part, from the evidence of the prosecution, seems pretty certainly to have been at some time to make a claim, on behalf of this child, to the estate of the deceased Dr. Burdell; and the great question is, was this a fraudulent production of a child, falsely pretending it to have been born

The People *v.* Cunningham.

of parents whose child would be entitled to inherit, with the intent thereby to intercept the inheritance?

The question seems to divide itself into several :

First. Was it a fraudulent production of the child?

Second. Did she falsely pretend that it was born of certain parents?

Third. Would a child of the parents of whom she pretended it was born be entitled to inherit?

Fourth. Was it her intention, by this fraudulent production, to intercept the inheritance?

First. Was the production of this child, under the circumstances, a fraud in law? Was any fraud in law perpetrated? Was any fraud attempted at that time? If there was any fraud perpetrated or attempted, against whom was it attempted? Who was, by this production of the child, defrauded or attempted to be defrauded? Was it Dr. Montague, or Captain Speight, or Inspector Dilks, the persons to whom she said, in answer to their inquiries, that it was her child? The child was there, and was carried thither, directly or indirectly, by her. But she had made no statement or claim respecting it, except to answer certain questions proposed to her; and if she had then proclaimed that it was the offspring of herself and Dr. Burdell, I do not see that it would be material. She intended, probably, at some future time, to perpetrate a fraud, or to attempt one, and this child may have been provided for the purpose as a means or instrument to be used in its accomplishment. She intended at a future time fraudulently to produce that child, and to assert its rights, as the offspring of herself and Dr. Burdell, to the property left by him. Did she so produce it at that time? She had made no such claim, and it seems to me quite doubtful if the fraudulent production contemplated by the statute was there made at the time she was arrested in her course; and without dwelling to show by what process of reasoning I arrive at the result, further than is suggested above, my conclusion is that there is at least great doubt,

even assuming the facts to be exactly as claimed by the prosecution, and susceptible of no contradiction or modification, whether a fraudulent production, such as the statute contemplates, and such as is declared to be a felony and punishable by imprisonment at hard labor for ten years, was there made and completed.

Second. Did she falsely pretend that it was born of certain parents, herself and Dr. Burdell? She certainly did, if I understand the meaning of her language.

Third. Would a child of the parents of whom she pretended it was born, that is, of herself and Dr. Burdell, be entitled to inherit? There is no evidence or claim that it would; on the contrary, the previous pretence of the accused in that respect is substituted and relied on by the prosecution for the legal fact. She had previously claimed or pretended to be the wife of Dr. Burdell, and if she had been so, a child of them would have been entitled to inherit. Her previous claim in that respect is the only evidence of the fact. This claim of hers, to be evidence at all, must, I suppose, come under the head of confession, and would be slight evidence of such a fact. She probably thought that a child of herself and Dr. Burdell would be allowed to inherit. There is no evidence that it would, however, and I think the case not without difficulty at this point. The production of a child, pretending it to have been born of parents whose child, it is pretended, would be entitled to inherit, is not the crime described in the statute. The pretended offspring of a pretended marriage is not the child whose production is so severely punished. The danger to society of a simulated marriage is not greater than that of other false pretences. The fact of a marriage is one which may be ascertained with the same care as other facts, and no stringent enactment has been made against such a pretence because none has been deemed necessary; but the facility with which spurious offspring of a genuine marriage may be imposed, and the great difficulty in detecting such a

The People *v.* Cunningham.

fraud where a marriage really exists, has been deemed to require the most rigorous punitory enactment for the protection of society. Not so, however, with respect to a pretended marriage, for that may be more easily detected, and no such stringent legislation against such a pretence is required, and never has been made.

Fourth. Was it her intent, by this production, to intercept the inheritance? The fraudulent production, the false pretence that it is born of parents whose child would be entitled to inherit, and the intent to intercept the inheritance, must unite to constitute the crime. We will assume that there was the fraudulent production and the false pretence as to its birth: What intention was there by that production and false pretence, at that particular time and place, to intercept the inheritance? Was there the intent, by the act accompanying it, which is requisite to constitute the crime? Was not all this scene in contemplation of and preparatory to acts intended to be performed at a future time, which acts would probably (had they been realized) have constituted the offence which the statute designed to punish? This statute has never received a judicial construction, that I am aware of, and no analogies for its construction have been suggested. Of course I am left without those aids in my endeavors to find a proper construction for it; and, in the brief and summary manner in which this matter has been disposed of, I can only hope to arrive at general accuracy in the result to which I shall come. To my mind there is great difficulty in applying this statute to the facts presented in this case; and I come readily, therefore, to the conclusion that there are very serious doubts about a conviction under it being practicable. Other circumstances of this case are also worthy of consideration. Her position in life, her social and family relations, the innumerable ties which have more or less restraint in every case, and her pecuniary means, may all be considered; but above all cir-

cumstances to be considered in this connection is her sex, which diminishes immeasurably, in my judgment, the power and probability of escape. This, in connection with her children, numerous, helpless and dependent, and each a hostage to society that she will remain where she can be subjected to the operation of law, seem to be of themselves almost adequate recognizances for her appearance for trial, and, strengthened by a bond for a reasonable amount, may, I think, be relied on, under all the circumstances, with entire safety. Perhaps no occurrence within our time has so electrified society, throughout all ranks and classes, as this and one shortly preceding it, with which, in the public mind, this unfortunate accused was also associated, and certainly no person under suspicion was ever more rigorously dealt with by public opinion ; and it is not remarkable that, under the influence of the prevailing sentiment by which every one must be affected in a greater or less degree, it should have been difficult to convince a conscientious and enlightened judge that it was safe and proper to admit her to bail. But now that the lapse of time has allowed the tempest of public feeling to subside, it would be not a little remarkable if a magistrate should be found to adjudge, upon all the circumstances of this case, that no amount of bail would render her production for trial reasonably secure. The value of this right, to be discharged on giving bail, to her and her family at this most critical juncture, when, in addition to all ordinary reasons, its importance is immeasurably enhanced by her necessities for it, to enable her to prepare for the ordeal through which she is about to pass, is too apparent to call for a remark. But the importance to society, that the law which depends for the support and enforcement on the respect and confidence it should maintain in the minds of the public, should not be allowed to work injustice and oppression, is no less momentous; for, with us, nothing can be more fatal than a distrust of public justice. The scenes of violence and outrage occurring from

time to time in regions which we are accustomed to regard as less favored than our own, are not more to be deprecated because they are done in open defiance of law. On the contrary, the same amount of injustice perpetrated in the name and under the forms of legal justice, would go farther to undermine and break down society, because it would assume the livery and feign the sanctity of judicial enactment.

My conclusion is, that the ends of public justice will be answered by admitting the prisoner to bail in the sum of five thousand dollars.

---

SUPREME COURT. New-York General Term, October, 1857. *Mitchell,* *Davies* and *Clerke,* Justices.