Andrews, J.
The governor of the State of Michigan, issued his requisition directed to the governor of this State demanding the arrest of Joab Lawrence, the relator, as *186 a fugitive from justice from Michigan, and his delivery to an agent of that State, named in the requisition. Accompanying the requisition were affidavits purporting to have "been made by one Ward before a police justice of Detroit, in which it was alleged that the relator and one Whitney, and other persons unknown, on the 7th of October, 1872, at the city of Detroit, “ unlawfully, fraudulently, falsely and deceitfully did combine, conspire, confederate and agree together by diverse false pretences, subtle contrivances and devices to obtain and acquire unto themselves from one Eber B. Ward,” shares of ' stock, and property specified, and that they did on that day and at the place before stated, “ by divers false pretences, etc., obtain and acquire to themselves from the said Ward,” the said stock and property, with intent to cheat and defraud, etc. There is also annexed to the requisition a paper, purporting to be a warrant issued by the magistrate before whom the affidavits were taken for the arrest of the relator for the offence charged therein, and a request in writing from the prosecuting attorney of Wayne county, to the governor of Michigan, that a requisition should be issued to the executive of Hew York, for the apprehension of the relator. Upon the presentation of the requisition with the accompanying papers to the executive of this State, he issued his warrant for the apprehension of the relator, and after his arrest thereunder, he sued out his writ of habeas corpus^ and the question arising in the case, and upon which its determination must we think depend, is whether the papers presented to the executive of this State, and upon which the rendition of the relator as a fugitive from justice was demanded, were in form and substance sufficient to authorize the issuing of the executive warrant under which the relator is held. It was not claimed by the counsel for the people, that if the papers were defective and insufficient, it was not competent for the court to take cognizance of the question and discharge the prisoner. Courts have exercised the right to interfere and to examine the grounds upon which the executive warrant in such cases has issued, and the jurisdiction is justified both by reason and *187 authority. (Ex parte Smith, 3 McLean, 121; In re Clark, 9 Wend., 219.) The right of a State to demand and the obligation of a State upon which the demand is made to surrender a fugitive from justice, rests exclusively upon the federal Constitution, and the act of Congress of 1793. The Constitution declares that, “ a person charged in any State with treason, felony or other crime, who shall flee from justice and be found in any other State, shall on demand of the executive authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the crime.” It is plain from the language of this clause of the Constitution, that the obligation of a State to deliver a fugitive from justice, on demand of the State from which he fled, arises when the fugitive is charged with crime within the State demanding the surrender. The question of his guilt or innocence is wholly irrelevant in determining the action of the executive of the State upon which the demand is made. That question is to be investigated and determined by the courts of the State where the alleged crime was committed. But there must be a charge of crime existing against the fugitive in the State demanding his surrender, before the demand can legally be made, and it was said by Taney, Ch. J., in Com, of Kentucky v. Dennison (24 How. [U. S.], 104) that it must be a charge made in the regular t ourse of judicial proceedings.
The act of 1793, passed for the purpose of giving effect to ihis constitutional provision and establishing a uniform mode of procedure in cases within it, provides in what manner the fact that the fugitive whose surrender is demanded is charged with crime, shall be made known to the executive of the State upon whom the demand is made; for it is evident that it is a condition precedent to the obligation to surrender that the authorities shall be apprised of the existence of the facts upon which the duty depends. By that act the executive authority of the demanding State is to produce to the executive authority of the State upon which the demand is made, “ a copy of an indictment found, or an affidavit made before *188 a magistrate of any State or territory (from which the demand proceeds) charging the persons so demanded with treason, felony or other crime, certified as authentic by the governor or chief magistrate of the State or territory from which the person so charged fled; ” and thereupon it is made the duty of the executive authority of the State or territory to which such person shall have fled, to cause him to be arrested and delivered up, as prescribed by the act. It does not appear that an indictment has been found against the relator; and the question arises whether the affidavits charge him with the commission of a crime in the State of Michigan; for unless this appears, they are fatally defective, and the warrant for his rendition was unauthorized. The word crime, in the clause of the Constitution which has been quoted, embraces every act forbidden and made punishable by the law of a State, and the right of a State to demand the surrender of fugitives from justice, extends to all cases of the violation of its criminal law. (Com. of Kentucky v. Dennison.) Felonies and misdemeanors, offences by statute and at common law, are alike within the constitutional provision; and the obligation to surrender the fugitive for an act which is made criminal by the law of the demanding State but which is not criminal in the State upon which the demand is made, is the same as if the alleged act was a crime by the law of both. The prisoner is charged in the affidavits with unlawfully combining and conspiring with one Whitney, and others, by false pretences and devices to obtain the property of Ward, with intent to cheat and defraud him ; and it is alleged that the conspirators, in pursuance of the conspiracy, did obtain the property with a like intent. The false pretences are not set out, nor the means by which the cheat was to have been, or was effected. It was in the power of the complainant to have specified, the pretences and means used, for he alleges that the object of the conspiracy was accomplished. In an indictment for a cheat at common law the false token must be alleged; and in an indictment for false pretences the pretences must be averred, so that the accused may be pre *189 pared to meet the accusation, and that the court may see that an indictable offence is charged; for there are many cheats which are not indictable, and false pretences which are not within the statute. (2 Term R., 586; East’s Grown Law, 837; People v. Williams, 4 Hill, 9 ; People v. Crissie, 4 Denio, 529.) An allegation that one obtained the goods of another by false pretences, or by cheating, is not, in a legal sense, a charge of crime, for it may be true, and yet no crime may have been committed. It is said, however, that in an indictment for a conspiracy to cheat, or defraud, another of his property, by false tokens or pretences, it is sufficient to aver the combination and the object, without setting out the means or the pretences by which the end was-to be attained. This question underwent an elaborate examination and discussion, in the Court of Errors, in the case of Lambert v. The People (9 Cow., 578). The defendant and others were indicted for conspiracy, and the indictment charged in general terms a conspiracy to cheat and defraud the Sun Insurance Company of their property, by wrongful and indirect means, and that in pursuance of the conspiracy and by undue, indirect and unlawful means, the defendants obtained the property of the company. The defendant was convicted ; and on error to the Supreme Court the conviction was affirmed. The Court of Errors, by the casting vote of the president, reversed the judgment of the Supreme Court, and held the indictment bad. The law of conspiracy was fully considered in the able and learned opinions delivered by Senators Spencer and Stebbins in that case; and nearly all the English and American cases on the subject up to that time were examined. The difference of opinion between the members of the court arose mainly from the different views entertained as to what constituted the criminal offence of conspiracy at common law. The majority of the court held that the offence consisted either in a combination to do a criminal act, or to do an act not criminal in itself by criminal means; that in the one case the object, and in the other the means, determined the criminality of the combination. The minority of the court were of opinion *190 that a confederacy to injure another in his person, property or character, was a conspiracy at common law, although the act to be done, if done by an individual and without any combination with others, would not be indictable. The court held that, as obtaining the property of another by cheating and fraud did not, necessarily, import an indictable offence, it was necessary in an indictment for a conspiracy to defraud, to set out the means by which the fraud was to be effected, so that the court can see whether a crime was intended. Soon after the case of Lambert v. The People was decided, the crime of conspiracy was defined by statute; and by that definition a conspiracy to cheat and defraud another of his property is indictable when accompanied by overt acts, and when the means to be used are criminal or are such as would, if the fraud was accomplished, constitute the offence of cheating, or obtaining money or property by false pretences. (2 R. S., 692, § 8.) The case of Lambert v. The People lias been followed by the courts in Massachusetts and Pennsylvania. (Com. v. Eastman, 1 Cush., 190; Hartman v. Com., 5 Barr, 60.) It has not been overruled in this State; and the legislature has since adopted the principle of the case in defining the offence of conspiracy. We are aware that Rex v. Wix (2 B. & Aid., 204), and other English cases, are adverse to the doctrine of Lambert v. The People but we think this case was well decided, and that, at all events, we should adhere to the authority of that decision.
The affidavits presented to the executive of this State, accompanying the demand for the rendition of the relator, did not, within the ease of Lambert v. The People, contain a charge of crime, nor did it appear that the relator was guilty of any offence punishable by the laws of Michigan. It cannot be held that any less degree of certainty is admissible in an affidavit charging the conspiracy, than is required in an indictment for the same offence. If any distinction exists in this respect the affidavit should be the more full and specific. It is usually the ex parte statement of the accuser. An indictment is found by a body standing indifferent *191 between the parties, and charged, upon oath, to inquire of offences, and which is supposed to act upon competent proof in finding the bill. If a conspiracy to do a wrongful act, affecting the property of another, is an offence in the State of Michigan, although neither the end or the means (disconnected with the confederacy) are criminal, that fact should have been shown by the affidavits. The court cannot take judicial notice of the law of that State; and the presumption in the absence of proof is, that its courts agree with our own in declaring and interpreting the common law. The fact that an inferior magistrate has issued a warrant of arrest upon the same proof as was presented to the executive of this State, does not justify the inference that a legal crime was charged in the affidavits. And, moreover, the alleged warrant is in no way identified or referred to in the affidavits, and could not be considered by the executive in deciding the question presented to him. These considerations lead to a reversal of the order of the General Term, and to the discharge of the relator. He is entitled, in common with all citizens, to such protection as the law gives to all; and, while the reversal of the proceedings may lead to the escape of an offender, we cannot close our eyes to the fact that criminal prosecutions for false pretences are often perverted to the accomplishment of personal and private ends. It would be a dangerous precedent if it should be held that a man could be deprived of his liberty and removed to another State, upon an accusation so vague and unsatisfactory as is contained in the affidavits in this case. It is a reasonable rule, supported by obvious considerations of justice and policy, that when a surrender is sought upon proof, by affidavit, of a crime, the offence should be distinctly and plainly charged. Security to personal liberty demands this, and the State will meet the full measure of its obligation, under the federal Constitution, if it requires this before consenting to the arrest and removal of alleged offenders.
We are of opinion that the previous adjudications in proceedings on habeas corpus, are no answer to a new writ, *192 issued on the application of the relator. The case is not within the principle of Mercein v. The People (25 Wend., 64), where the controversy related to the right to the custody of an infant child. In this case the relator is restrained of his liberty; and a decision under one writ refusing to discharge him, did not bar the issuing of a second writ by another court or officer. (Ex parte Kaine, 3 Blatch. C. C. R., 1; Ex parte Partington, 13 M. & W., 679; The King v. Suddis, 1 East, 306.)
The judgment of the General and Special Terms should be reversed, and judgment entered discharging the relator.
All concur, except Grover, J., dissenting.
Judgment accordingly.